Case: 1:23−mj−00087
Assigned To : Harvey, G. Michael
Assign. Date : 4/25/2023
Description: Complaint W/ Arrest Warrant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No: |
| | : | __UNDER SEAL__ |
| v. | : | |
| | : | VIOLATIONS: |
| FIROZ PATEL, | : | 18 U.S.C. § 1956(a)(1)(B)(i) |
| | : | (Laundering of Monetary Instruments) |
| Defendant. | : | |
| | : | 18 U.S.C. § 1957(a) |
| | : | (Engaging in Monetary Transactions in |
| | : | Property Derived from Specified |
| | : | Unlawful Activity) |
| _____ | : | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND ARREST WARRANT

I, Special Agent Eugene Sveum, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND SUMMARY OF PROBABLE CAUSE

I make this affidavit in support of an application for a criminal complaint and an arrest warrant for Firoz Patel.  There is probable cause to believe that Patel violated: 1) 18 U.S.C. § 1956(a), the laundering of monetary instruments; and 2) 18 U.S.C. § 1957, engaging in monetary transactions in property derived from specified unlawful activity.

As set forth in detail below, investigation by agents of the Department of Homeland Security, Homeland Security Investigations ("HSI") revealed that Firoz Patel, his brother Ferhan Patel, the company they operated - Payza (also known as MH Pillars Ltd., AlertPay, Damaras Ltd., etc.) and other identified and unidentified subjects conducted business in the United States, Canada, and other locations around the world.  As noted below, each of MH Pillars, d/b/a Payza, Firoz Patel and Ferhan Patel were indicted and pled guilty to conspiracy under 18 U.S.C. § 371 and admitted various facts in connection therewith.

After Firoz Patel was sentenced, but before he self-reported to a United States Bureau of

Prisons facility, he deposited 450 Bitcoin (bitcoin BTC) (valued at $24,020,699.83 USD on that date), into an interest earning account at Blockchain.com.  That bitcoin is the proceeds of Payza's prior illicit activities.  By the time that a seizure warrant was obtained for this bitcoin, it had earned approximately nine bitcoin in interest.

## AGENT BACKGROUND

I am a Special Agent with the United States Department of Homeland Security ("DHS"), United States Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"). I am currently assigned to the HSI DC Financial Crimes Group where I specifically work on money laundering, fraud, and other financial criminal activities.  During this time, I was also previously assigned to the HSI DC Financial Crimes Group from 2011 to 2017.  I was also assigned to the Washington, D.C. Financial Crimes Task Force, where my responsibilities included the investigation of possible criminal violations of the money laundering statutes and related offenses.  I have received specific training involving investigations of financial crimes, money laundering, fraud, and asset forfeiture.  I have also obtained the Certified Anti-Money Laundering Specialist (CAMS) certification from the Association of Certified Anti-Money Laundering Specialists (ACAMS) organization.  Based upon my training and experience, I am familiar with the methods of operation employed by subjects in unlicensed money service businesses and money laundering operations.

I have personally conducted or assisted in numerous investigations of alleged criminal violations of the Bank Secrecy Act and Money Laundering statutes, involving multiple jurisdictions in addition to the United States.  I have participated in gathering evidence to obtain search and seizure warrants relating to financial crimes.  Among other things, my experience as a

HSI special agent has included the investigation of cases involving the use of computers and the Internet to commit financial crimes, to include the use of virtual currency such as Bitcoin.

The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in this investigation and from other law enforcement officers and analysts who have been involved in this investigation, on documents that I have reviewed, and on my training and experience.  Because this affidavit is being submitted for a limited purpose, I have not set forth all the information known to me concerning this investigation.  Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of this application for a criminal complaint and an arrest warrant.  Where I have reported statements made by others, or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

## STATUTORY BACKGROUND OF VIOLATIONS

This affidavit sets forth information about the underlying statutory violations in the previously-charged case as well as those at issue in Firoz Patel's new conduct.

Title 18 U.S.C. Section 1960 prohibits knowingly conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed money transmitting business, which affects interstate or foreign commerce in any manner or degree.  Under 18 U.S.C. § 1960(b)(2), "the term 'money transmitting' includes transferring funds on behalf of the public by any and all means including but not limited to transfers within [the United States] or to locations abroad by wire, check, draft, facsimile, or courier."  Payza routinely and extensively received and transferred funds on behalf of the public both within this country and abroad.  I am aware that unlicensed money transmitters are often used by criminals to transfer funds among associates and to launder illegal proceeds for crimes such as terrorist financing, narcotics trafficking, identity theft, and

child pornography.

Title 18 U.S.C. Section 1960(b) delineates the three types of unlicensed money services businesses. Title 18 U.S.C. Section 1960(b)(1)(A) makes it a federal offense to operate a money transmitting business without a license in a state or the District of Columbia, where such unlicensed operation is punishable as a misdemeanor or a felony under state law.  For purposes of 18 U.S.C. § 1960(b)(1)(A), it is not required that the defendant knew that he was required to be licensed or that the operation of such a business without a license was so punishable.

The District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq., requires all money transmission businesses to obtain a license by the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia.  Pursuant to D.C. Stat. § 26-1001(10), "'[m]oney transmission' means the sale or issuance of payment instruments or engaging in the business of receiving money for transmission or transmitting money within the United States, or to locations abroad, by any and all means, including but not limited to payment instrument, wire, facsimile, or electronic transfer."  Pursuant to D.C. Stat. § 26-1023, a violation of this statute is a felony punishable by a fine of not more than $25,000, imprisonment of not more than five years, or both.  MH Pillars Incorporated d/b/a Payza was engaged in the business of "money transmission," in that it engaged in the business of receiving money for transmission and transmitting money within the United States and to locations abroad, by wire and electronic transfer.  MH Pillars Incorporated d/b/a Payza failed to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia, in violation of § 26-1002 of the D.C. Code, and thus, in violation of Title 18 U.S.C. Section 1960(b)(1)(A).

Title 18 U.S.C. Section 1960(b)(1)(B), which incorporates Title 31 U.S.C. Section 5330, punishes an individual or entity that operates an unlicensed money transmitting business without having

registered with the Financial Crimes Enforcement Network (FinCEN).   FinCEN defines money

transmission services as, "the acceptance of currency, funds or other value that substitutes for

currency from one person and the transmission of currency, funds or other value that substitutes

for currency to another location or person by any means."   *See* Bank Secrecy Act Regulations -

Definitions and Other Regulations Relating to Money Services Businesses, 76 FR 43585 (July

21, 2011).   "'Any means' includes, but not limited to, through a financial agency or institution; a

Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of

Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an

informal value transfer system or [a]ny other person engaged in the transfer of funds."   31 C.F.R.

§ 1010.100(ff)(4).   MH Pillars Incorporated d/b/a Payza registered with FinCEN as a money

transmitting business on May 28, 2012.   However, MH Pillars'/Payza's registration with

FinCEN lapsed on December 31, 2014.   After that day, Payza was no longer authorized to act as

a money remitting business.   MH Pillars Incorporated d/b/a Payza has operated as a money

remitting business both prior to May 28, 2012, as well as after December 31, 2014, without the

statutorily required registration.

Title 18 U.S.C. Section 1960(b)(1)(C) punishes an individual or entity who operates an

unlicensed money transmitting business that is involved in the transportation or transmission of funds

that are known to have been derived from a criminal offense or are intended to promote or support

unlawful activity.   MH Pillars Incorporated d/b/a Payza knew, or had reason to know, that a substantial

portion of the funds it was transmitting were criminally derived as further discussed below.

Title 18 U.S.C. Section 1343, the wire fraud statute, punishes those who, having devised

or intending to devise any scheme or artifice to defraud, or for obtaining money or property by

means of false or fraudulent pretenses, representations, or promises, transmits or causes to be

transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.  Title 18, U.S.C., Section 1349 criminalizes a wire fraud conspiracy.

Title 18 U.S.C. Section 1956(a)(1)(A)(i), the domestic promotional money laundering statute, criminalizes conducting or attempting to conduct a financial transaction which involves the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity, that is a violation of, *inter alia*,  Title 18 U.S.C. Section 1343, wire fraud, or Title 18 U.S.C. Section 1960, unlicensed money transmitting business.

Title 18 U.S.C. Section 1956(a)(1)(B)(i), the domestic concealment money laundering statute, criminalizes conducting or attempting to conduct a financial transaction which involves the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represents the proceeds of some form of unlawful activity, knowing that such transaction was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, that is a violation of, *inter alia*, Title 18 U.S.C. Section 1343, wire fraud, or Title 18 U.S.C. Section 1960, unlicensed money transmitting business.

Title 18 U.S.C. Section 1956(a)(2)(A), the international promotional money laundering statute, criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful

activity, that is a violation of, *inter alia*, Title 18 U.S.C. Section 1343, wire fraud, or Title 18 U.S.C. Section 1960, unlicensed money transmitting business.

18 U.S.C. § 1957 (the spending statute) criminalizes knowingly engaging and attempting to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and that is derived from specified unlawful activity, that is a violation of, *inter alia*, 18 U.S.C. § 1343, wire fraud, or 18 U.S.C. § 1960, unlicensed money transmitting business.

Title 18 U.S.C. Section 1956(h) criminalizes a conspiracy to violate Title 18 U.S.C. Sections 1956 or 1957.

Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property, is subject to civil forfeiture. Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in a violation of 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property, is subject to criminal forfeiture. Forfeiture pursuant to these statutes applies to a larger class of property than forfeiture under 18 U.S.C § 981(a)(1)(C) because it applies to more than just the proceeds of the crime. Forfeiture based on money laundering and money transmission business offenses is required for all property "involved in" the crime, which can include clean or legitimate money that is comingled with tainted money derived from illicit sources.

## PROBABLE CAUSE

Based upon my investigation (as well as facts admitted in connection with the earlier prosecution and conviction of Firoz Patel, Ferhan Patel, and their corporate entity), probable cause exists to believe that Payza used personal and business bank accounts at financial institutions in the United States and abroad to operate an unlicensed international money

transmitting business on behalf of customers located in multiple jurisdictions, including the United States, Vietnam, Pakistan, and Egypt.  Payza also offered cryptocurrency services to customers as a medium for facilitating these transactions.  The investigation, as explained in greater detail below, has revealed that the focus of Payza's money transmitting business was the transmission of funds from numerous locations in the United States where Payza was not licensed. A large amount of these funds was transferred in and out of Payza's bank accounts, to include cryptocurrency wallets, held in or accessed in the United States and outside the United States.  Moreover, Payza operated as a money laundering front for criminals, conducting a variety of crimes, including wire fraud via Ponzi schemes.  Payza was a preferred platform for transferring illegal proceeds because of Payza's weak Know Your Customer ("KYC") policy and compliance program that failed to weed out bad actors.  Whatever legitimate business Payza customers transacted was merely part of the front the coconspirators built to conceal and promote the illegal transmission of illegal proceeds.

As discussed below, on March 18, 2018, MH Pillars, d/b/a Payza, Firoz Patel and Ferhan Patel were indicted on various charges.  *See* D.D.C. Criminal Case No. 18-cr-053.  On July 16, 2020, each of these defendants pled guilty to Conspiracy to Commit Crimes against the United States in violation of 18 U.S.C. § 371 and they were all sentenced on November 10, 2020.  The Court issued Consent Orders of Forfeiture against all three of these defendants, each of which contained the following provision: "That the following property is declared forfeited to the United States: any property, real or personal, involved in the commission of Count One, and any property traceable to such property pursuant to Title 18, United States Code, Section 982(a)(1)." *See* D.D.C. Criminal Case No. 18-cr-053, ECF Nos. 123, 132, and 133.

A.                    Background on Payza

Beginning in May 2013, the United States Government, including HSI and the

Washington, D.C. Financial Crimes Task Force, initiated an expansive financial investigation of

MH Pillars Ltd., doing business as Payza.  The investigation revealed that starting in

approximately 2005, the principals of Payza knowingly operated an unlicensed money service

business used by criminals as a conduit to launder illicit proceeds.  Payza, through its robust

network of shell companies and criminal associates, became the preferred method for criminals

to launder illicit proceeds and transfer funds to other criminal associates.  At its peak, the volume

of illicit proceeds moving through the Payza system was hundreds of millions of dollars

annually.  Payza, whose operations were based in Canada, used Canada as a safe harbor to

conduct their illicit activity while committing numerous financial crimes via the Internet

affecting interstate commerce in the United States and internationally.

Payza was an internet based financial institution that specialized in providing services to

"under-serviced" areas of the global economy.  According to its website, Payza was the leading

global online payment platform specializing in e-commerce processing, corporate disbursements,

and remittances for individuals and businesses around the world.  Payza provided localized bank

transfers, global bank wires, credit and debit card services, prepaid cards and other services.  At

one time, Payza purported to have over thirteen million members offering services in 190

countries and in at least 25 different currencies.

On March 19, 2012, "MH Pillars Incorporated" registered with the New York

Department of State, Division of Corporations as a domestic business corporation.  I learned

during the investigation that "MH Pillars Limited" was a pre-existing business registered in the

United Kingdom, while "MH Pillars Incorporated" may have been a pre-existing business

registered in Canada under a different name.

Law enforcement agents obtained corporate documents listing Firoz Patel and Ferhan Patel as the principals of Payza.  Law enforcement learned that although the organizational structure of the numerous Patel-operated companies frequently changed, Firoz Patel has consistently maintained a controlling interest in Payza and its parent company (MH Pillars LTD). Although MH Pillars was the parent company of Payza, MH Pillars also had a parent company, Solitaire Holdings located in Belize, which is also the same address that Firoz Patel provided to Blockchain.com as the address of Musa Patel (35 Barrack Road, 2nd Floor, Belize City, Belize).

Law enforcement agents interviewed numerous then-current and former employees and business associates of Payza, many of whom cooperated with the government.  These individuals confirmed Payza's involvement in nefarious activity and provided evidence that Payza was operating without the requisite licenses and was laundering criminal proceeds.  Many of these individuals provided a detailed account of conversations they had with Firoz Patel, Ferhan Patel, and other members of Payza leadership regarding the illicit activity of Payza.  Moreover, these individuals produced emails and other corporate documents that corroborated their statements. Several former Payza employees reported that when they voiced concerns to Firoz Patel and Ferhan Patel about the illegal activity of the company, their access to certain records were revoked and shortly thereafter their employment was terminated.

Corporate documents obtained via judicially authorized email search warrants of several Payza executives led to the discovery of numerous conversations amongst Payza's leadership regarding the operation of an unlicensed money transmitter business and money laundering. These documents included conversations about Payza's lack of licensure, sanitizing reports to prevent third party disclosure of illicit activity, and the creation of numerous shell companies and

bank accounts used to further the conspiracy.

Included in these emails detailing the private conversations of Payza's leadership was an internal audit conducted by Payza on 106 customer accounts.  *See* 14-mj-00534 (AK) Sealed; 14-mj-00535 (AK) Sealed; 15-mj-00351 (AK) Sealed; and 15-mj-00352 (AK) Sealed.  The audit revealed that the majority of these accounts lacked sufficient documentation to properly identify the customer, commonly known as KYC.  Of the 106 Payza customer accounts that were audited, only 17 contained sufficient documentation to properly identify the customer.  Stated differently, 84% of the Payza accounts that were audited contained insufficient KYC and compliance data, creating an opportunity for these individuals to send criminal proceeds undetected.

The Rex Venture Group (a/k/a Zeek Rewards) offers the primary example of Payza being used to launder Ponzi scheme proceeds.  Law enforcement learned that for the vast majority of 2012, Payza's primary transaction activity related to a single user, Paul Burks, the individual who ran the Rex Venture Ponzi scheme.  The records reflect at least $100,000,000 in transactions conducted from and to Burks' Payza account.  On or about August 17, 2012, the Securities and Exchange Commission (SEC) filed a civil complaint in the United Stated District Court for the Western District of North Carolina against Rex Venture Group and Paul Burks for the operation of approximately a $600,000,000 Ponzi and pyramid scheme (3:12-cv-519).  Burks' transactions via Payza are consistent with the laundering of proceeds of the Rex Venture Group Ponzi scheme.  Numerous of these transactions were for high dollar amounts, often over $10,000.

Emails among Payza employees obtained via search warrants revealed that Payza attempted to encourage the Rex Venture Group to relocate operations outside of the United

States shortly before it was shut down by the SEC.

In addition to the Rex Venture Group Ponzi scheme, law enforcement agents were able to identify other Ponzi schemes under investigation by law enforcement that Payza similarly suggested to relocate abroad.  I know that one reason to advise customers to relocate assets and incorporation documentation abroad is to inhibit the ability of law enforcement to shut down the illegal operation and to criminally prosecute those involved in the conspiracy while they are in the United States.

Emails obtained from these search warrants indicated Payza was involved in trying to introduce Bitcoin as a method of transferring funds or making payments via the Payza platform as early as 2014.  The emails also showed Payza paid at least one employee their salary in Bitcoin.  That employee was hired by Payza to help launch the ability of Payza to incorporate Bitcoin into their business model. At the time that employee was hired by Payza, he was awaiting sentencing for aiding and abetting the operation of an unlicensed money transmitting business related to the Silk Road marketplace.

Corroborating these findings, on August 11, 2014, Payza issued a press release announcing that customers could now purchase bitcoin and withdraw funds from their Payza accounts to their Bitcoin wallets.  Payza subsequently established a relationship with a Panama based cryptocurrency wallet service provider called Coinapult, which provided Payza with the Bitcoin it needed to operate in the digital currency space.

B.      Payza's Use of Shell Companies in Furtherance of the Criminal Conspiracy

One method used by Payza and its principals to insulate themselves and aid in the concealment of their illicit activity was to frequently change the leadership and the name of companies involved in illicit activity or to keep the name but to conduct business under a trade

name or alias.  Law enforcement has learned that despite the frequent changes in the

organizational structure of Patel-operated companies that Firoz Patel consistently maintained a

controlling interest.  These changes were often triggered by actions taken by law enforcement, a

financial institution, or regulatory authority against the company due to the underlying criminal

activity.  I know that one reason to frequently change the name of a business or its leadership is

to aid in the concealment of the company's true leadership, ownership and the origin of funds

passing through it.

For example, Firoz Patel and Ferhan Patel established Alertpay, which was incorporated

in the United States, in or about May 2005.  From on or about April 2005 to May 2012, Alertpay

operated as an unlicensed money service business.  Many of Alertpay's customers used Alertpay

to transmit proceeds of criminal activity.

Regulators from Arkansas, Georgia, Kentucky, New Hampshire, New York and North

Dakota notified Alertpay about its unlicensed activity in their respective states.

By early 2012, AlertPay had received negative press attention that focused on its servicing

of customers involved in various illegal schemes.  In response, Firoz Patel told others that

AlertPay would rebrand itself and he would step down from day-to-day operations and would

bring in a new CEO.  In early 2012, Firoz Patel purchased MH Pillars, a shell company that had

been formed in the United Kingdom.  MH Pillars, doing business as Payza, claimed to have

purchased AlertPay and AlertPay accounts were transitioned to Payza accounts.  Firoz Patel was

listed as the Executive Vice President of Payza, however, he was the most senior person at the

company and ultimately, all employees reported to him.  The transition to Payza was marketed as

an acquisition of AlertPay's technology and customers by a UK-based entity and a UK based

CEO.   In fact, the person named as the CEO was merely a figurehead who lacked real authority

and the Patel brothers controlled everything that occurred at Payza.  The substantive changes Firoz Patel had claimed would occur did not materialize.  Specifically, Payza continued to support Ponzi and pyramid schemes.

Payza began transmitting money in or about May 2012, at or about the same time Firoz Patel and Ferhan Patel transitioned Alertpay customer accounts to Payza accounts.  The transition occurred in part because numerous state regulators contacted Alertpay about its unlicensed activity and because it had been revealed that Alertpay had taken on customers trafficking in child pornography.  The transition also occurred because on June 7, 2012, Firoz Patel was indicted in the U.S. District Court for Middle District of Tennessee on two counts of money laundering associated with his operation of Alertpay to launder illicit proceeds derived from the importation and distribution of anabolic steroids and other controlled substances.  Payza represented a continuation of the illegal activity begun by Alertpay.

Shortly after the establishment of Payza, regulators from California, Connecticut, Kansas, Kentucky, New York, Ohio, Vermont, and West Virginia contacted Payza about unlicensed money transmitting activity in their respective states.

In addition to Payza's unlicensed money transmission activity, Payza's customers were: 1) primarily merchants operating Ponzi and Pyramid schemes, High Yield Investment Programs, Money Cyclers, and Multi-Level-Marketing schemes with no products; 2) and the related victims of such schemes.

In the factual proffers in support of their guilty pleas, Firoz Patel and Ferhan Patel admitted that many of Payza's customers transmitted criminally derived proceeds via Payza. The transmission of these funds promoted the continuation and operation of these underlying criminal schemes.

After Payza's questionable customer base was brought to the attention of Payza's leadership by at least two different vendors providing supportive services to Payza, the Patels again sought to make corporate changes designed to conceal the company's involvement in criminal activity. Specifically, the Patels established Egopay, which was incorporated in Belize, in or about May 2012, and operated as an unlicensed money service business.

While concealing its ties to the Patels, Egopay took on numerous Payza merchant-customers who were operating Ponzi and Pyramid schemes, High Yield Investment Programs, Cyclers, and Multi-Level-Marketing schemes with no products. Emails obtained in a judicially authorized search warrant revealed that Firoz Patel, Ferhan Patel, and others directly facilitated the transition of these schemes from Payza to Egopay. This transition enriched the Patels, allowing them to continue supporting the underlying criminal activity of these schemes while claiming publicly that Payza was not providing services to these merchants.

A Payza employee stated that Firoz Patel owned a lot of companies in other people's names, such as Ferhan Patel, and other friends and family members. This employee knew of at least 30 companies that Firoz Patel had created and owned in furtherance of the conspiracy. The employee stated that Firoz Patel's name being attached to the companies was causing him problems. As a result, Firoz Patel would create companies and place them in someone else's name but would still have a "blind trust" behind them so that he still exercised full control. The employee stated that at times Firoz Patel would ask him/her to falsify corporate documents and that Firoz Patel kept changing the directors of companies based on what he wanted. The employee stated that Firoz Patel eventually became frustrated with him/her when he/she refused to comply with Patel's request to alter corporate documents, to include documents that would be used in legal proceedings. The employee ultimately left Payza, fearful of Firoz Patel.

C.      Judicial Actions Against Firoz Patel and Payza

On November 14, 2013, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant to seize approximately $4,000,100, representing Payza funds held on deposit at Meriwest Credit Union (1:13-mj-836).

On January 27, 2014, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant to seize approximately $100,000, representing Payza funds held on deposit at Wells Fargo Bank (1:14-mj-0059).

On June 24, 2016, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant to seize approximately $250,359.45, representing Payza funds held on deposit at Cedar Rapids Bank and Trust Company (1:16-mj-483).

On December 21, 2016, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant to seize approximately $6,454,267.63 representing Payza funds held on deposit at a United Kingdom financial institution used to facilitate the illicit activity of Mazarine Commerce Inc. and other Payza related entities (1:16-mj-00857).

On June 23, 2017, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant to seize approximately $1,594,205.63, representing Payza funds held on deposit at a United Kingdom financial institution used to facilitate the illicit activity of Payza related entities (1:17-mj-438).

On March 18, 2018, MH Pillars Ltd. doing business as Payza and its principal officers, Firoz Patel and Ferhan Patel, were indicted on numerous charges stemming from their operation of the Payza criminal enterprise.  MH Pillars Ltd. doing business as Payza was charged with the

Operation of an Unlicensed Money Service Business, in violation of 18 U.S.C. § 1960. The
Patels were each indicted on a Conspiracy to Commit Offenses against the United States in
violation of 18 U.S.C. § 371; Operation of an Unlicensed Money Service Business, in violation
of 18 U.S.C. § 1960; Money Laundering in violation of 18 U.S.C. § 1956, and Money
Transmitting without a License, in violation of District of Columbia Code 26-1002.   Two other
co-conspirators were also indicted.

On March 20, 2018, Law enforcement agents obtained a seizure warrant for the website
domains, www.payza.com and www.alertpay.com, which were used to propagate the criminal
activity of Payza and its subsidiaries to include Mazarine Commerce Inc.

On June 11, 2019, a United States Magistrate Judge for the United States District Court
for the District of Columbia issued a seizure warrant to seize approximately $270,420.02
representing Payza funds held on deposit at Citibank, N.A. (X-0884).

On July 16, 2020, MH Pillars LTD, Firoz Patel, and Ferhan Patel all pled guilty to
Conspiracy to Commit Crimes against the United States.  The specific crimes that they pled
guilty to included Money Laundering and Operating an Unlicensed Money Service Business.

They were all sentenced on November 10, 2020 and both Firoz Patel and Ferhan Patel were
sentenced to periods of incarceration.  Included in this sentencing was an order that forfeited "any
property, real or personal, involved in the commission of Count One, and any property traceable
to such property pursuant to Title 18, United States Code, Section 982(a)(1)."  In addition, the
Court ordered the forfeiture of the $4,620,459.45 seized by the U.S. Government and all funds
restrained at Global Reach Partners and HSBC Bank held in the name of Damaras Limited in the
United Kingdom.

Both Firoz and Ferhan Patel were scheduled to self-surrender to a United States prison on

17

February 26, 2021.  However, because of the covid pandemic and limitations on their ability to travel to the United States due to their convictions, that date was delayed.  Ultimately, they completed their self-surrender on June 11, 2021.

On January 11, 2022, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant to seize approximately 459 bitcoin representing Payza funds held at Blockchain.com, a cryptocurrency exchange located in the United Kingdom.  The 459 bitcoin included the 450 bitcoin that Firoz Patel had initially deposited and the interest earned on those bitcoin.

     D.    <u>Digital Currency and Bitcoin</u>

Digital currency (or cryptocurrency) is a decentralized, peer-to-peer network-based digital medium of value or exchange which can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a government) to buy goods and services or exchanged for fiat currency or other digital currencies.  Digital or cryptocurrency can exist digitally on the Internet, in an electronic storage device, and in cloud-based servers.  Although not stored in any physical form, public and private keys are used to transfer digital currency from one person or place to another and can be printed or written on a piece of paper or other tangible object.  Digital currency can be exchanged directly person to person, through a digital currency exchange, or through other intermediaries.

Bitcoin ("BTC") is a type of digital currency. Bitcoin payments are recorded in a public ledger (*i.e.*, a "blockchain") that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity. Bitcoin and other cryptocurrencies are stored in virtual accounts called "wallets." A wallet is a software program that interfaces with blockchains and generates and/or stores public and private keys used to send and receive cryptocurrency.

To access bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to an account number while the private key is like the password to access that account.  Even though the public addresses of transactors are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.  And while it's not completely anonymous, bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

Cryptocurrencies are not illegal in the United States and are widely used to conduct both legitimate and unlawful business. Individuals can acquire Bitcoins through, for example, digital currency exchanges (*i.e.*, websites—such as Blockchain.com, which is described further below—that allow individuals to purchase or sell cryptocurrencies in exchange for fiat currency or other cryptocurrencies), ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by "mining."  An individual can mine Bitcoins by allowing his/her computing power to verify and record payments into the aforementioned public ledger.  Individuals are rewarded for this task by receiving newly created units of a cryptocurrency.

Although cryptocurrencies such as bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track the cryptocurrency.  As of April 21, 2023, one bitcoin is worth approximately

$28,094.80, though the value of bitcoin is generally much more volatile than that of fiat currencies.

Exchangers and users of Bitcoin and other digital currencies often store, and transact with, these cryptocurrencies in several ways, utilizing desktop, mobile, and online wallets; hardware devices; and paper wallets.  Desktop, mobile, and online wallets are electronic in nature and can be stored on mobile devices (*e.g.*, smart phones or tablets) or websites that users can access via a computer, smart phone, or any device that can search the internet.  Wallets can also be stored on external or removable media and hardware (such as USB thumb drives).  In addition, paper wallets contain an address and a QR code[1] with the public and private key embedded in the code.   Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "seed phrase" (random words strung together in a phrase, also known as a "recovery phrase") or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).  I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that the cryptocurrencies become potentially vulnerable to seizure and/or unauthorized transfer.

Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars.  According to guidance issued by the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger

---

[1]     A QR code is a matrix barcode that is a machine-readable optical label.

operating as a business, are considered money services businesses.[2]  Such exchanges and

exchangers are required to register with FinCEN and have proper state licenses (if required under

applicable state law).  From my training and experience, I know that registered money

transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML")

regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures

similar to those employed by traditional financial institutions. For example, FinCEN-registered

cryptocurrency exchangers often require customers who want to open or maintain accounts on

their exchange to provide their name, address, phone number, and the full bank account and

routing numbers that the customer links to an exchange account.

     E.     <u>Blockchain Analysis</u>

     While the identity of the Bitcoin address owner is generally anonymous (unless the

owner opts to make the information publicly available), law enforcement can identify the owner

of a particular BTC address by analyzing the Blockchain. The analysis can also reveal additional

addresses controlled by the same individual or entity. For example, a user or business may create

many BTC addresses to receive payments from different customers. When the user wants to

transact the BTC that it has received (for example, to exchange BTC for other currency or to use

BTC to purchase goods or services), it may group those addresses together to send a single

transaction. Law enforcement uses sophisticated, commercial services offered by several

different Blockchain-analysis companies to investigate BTC transactions. These companies

analyze the Blockchain and attempt to identify the individuals or groups involved in the BTC

---

[2]     *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering.

transactions. Specifically, these companies create large databases that group BTC transactions into "clusters" through analysis of data underlying BTC transactions.

Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable. The third-party Blockchain-analysis software utilized in this case is an anti-money laundering software used by banks and law enforcement organizations worldwide. This third-party Blockchain analysis software has supported many investigations and been the basis for numerous search and seizure warrants, and as such, has been found to be reliable. Computer scientists have independently shown that they can use "clustering" methods to take advantage of clues in how BTC is typically aggregated or split up to identify BTC addresses and their respective account owners.

Since the Blockchain serves as a searchable public ledger of every BTC transaction, investigators may trace transactions to BTC exchangers. Because those exchanges collect identifying information about their customers, subpoenas or other appropriate process submitted to these exchangers can, in some instances, reveal the true identity of the individual responsible for the transaction.

F.   Blockchain.com

According to its website (https://blockchain.com), Blockchain.com is a company that offers cryptocurrency wallet services, to include buying, selling, swapping, and interest services within a customer's Blockchain.com wallet.

Users of Blockchain.com's services can download a digital wallet application onto their smart phone or access the site through a computer.  A user typically accesses the wallet application through inputting a user-generated PIN code or password.  Users can then store, receive, and transfer cryptocurrencies via the Blockchain.com application and site.

G.    Deposit and Restraint of the Bitcoin Related to the Instant Offenses

On July 2, 2021, HSI DC learned that on April 27, 2021 (one month prior to Firoz Patel's self-surrender date), Firoz Patel deposited 450 BTC (valued at $24,020,699.83 USD on that date), into an interest earning account at Blockchain.com.  That bitcoin is suspected to be proceeds of Payza's prior illicit activities – as described below.  The bitcoin was ultimately frozen by Blockchain.com due to the account holder's suspected ties to Payza and the inability of the account holder to provide adequate KYC information.  The restraint was accomplished by transferring the bitcoin to a separate wallet.

Information obtained by HSI DC reflects the account with Blockchain.com was opened on April 25, 2021 in the name of Musa Patel, and the date of birth provided was November 25, 1947.  Musa Patel, with this same date of birth, is known to be the father of Firoz Patel, the primary target of the investigation and the owner of Payza.  I know based on my training and experience that using other people's names, which could include family members and friends, is a common way that criminals attempt to conceal the true ownership of illicit proceeds.

When the Blockchain.com account was opened, the phone number provided for the account owner was 514-991-4662, and the email provided for the owner was fijmeister@gmail.com (Email Account 1), as the identifiers.  During the course of the investigation into Payza, it was discovered that both this phone number and Email Account 1 were known to be associated with Firoz Patel, and not Musa Patel.

The person who opened this Blockchain.com account also provided an address of 35 Barrack Road, 2nd Floor, Belize City, Belize.  This address was used by Firoz Patel to incorporate at least six different shell companies while operating Payza, to include Ecommerce Worldwide d/b/a Egopay, that was used to provide services to Payza's highest risk clients, many

23

of which were criminal enterprises such as Ponzi schemes.

H.      Correspondence with Blockchain.com

Information obtained from Blockchain.com reflects that on April 30, 2021, Blockchain.com sent an email to Email Account 1 requesting further information for the purpose of obtaining additional KYC information due to irregularities with the account information provided at opening and the high value of the deposit.  One such irregularity was the fact that the account holder provided an address in Belize yet the IP address (IP ADDRESS 1) that was obtained by Blockchain.com during the transaction indicated they were actually located in Canada.

In that email, Blockchain.com asked for the full legal name of the account holder.  Despite the fact that the account was opened in the name of "Musa Patel" using Firoz Patel's email address, phone number, and a business address associated with Payza, the response provided to Blockchain.com was purported to be from an individual named "Vineet Tewari" on April 30, 2021 using Email Account 1.  However, payment information obtained from Google indicates the owner of Email Account 1 is actually Firoz Patel.  Furthermore, during the course of the investigation into Payza, it was discovered that an individual named Vineet Tewari was an employee of Payza's branch in India called Crescent Payments Private Limited, which is the d/b/a name for Crescent Business Solutions Private Limited.  The occupation provided to Blockchain.com for Tewari was the Director of Crescent Business Solutions Private Limited.  Based on this information, I submit that there is a direct link between Tewari and Payza's business operations.  The use of Tewari to further perpetuate the fraud upon Blockchain.com is consistent with Firoz Patel's prior use of Payza employees to open businesses and take actions to

violate the law, and specifically in this case. to conceal his money laundering activities..

The email from Blockchain.com to Email Account 1 also asked who Musa Patel was and why this name was used at account opening.  Tewari, using Email Account 1 responded, "[t]his was the name of the person who setup the account in first place. There was no way to change the name before I took over to my name for verification."  Blockchain.com also asked for additional information to explain the possession of the bitcoin.  The explanation provided was, "[t]he crypto currency was transferred from my friend's account, also at Blockchain.com who has loaned me the BTC to earn extra with. The BTC was purchased in years before (2015-2016) and was sitting in his Blockchain account for a few years, before it was then transferred to Binance to trade with, and then the extra brought back to Blockchain."  Blockchain.com determined this explanation did not make any sense and did not adequately explain the origin of the bitcoin.  This was one of the reasons cited by Blockchain.com as to why they ultimately decided to restrain the bitcoin.

Between April 30, 2021 and June 4, 2021, correspondence continued regarding the bitcoin between Blockchain.com and Email Account 1.  As noted above, Firoz Patel self-surrendered to a Bureau of Prisons facility on June 11, 2021.  Records obtained from Google show Email Account 1 was accessed at least 93 times during this time period.  A majority of the logins to Email Account 1 were done via computer and had an IP address that comes back to a location in Quebec, Canada (where Firoz Patel lived prior to his self-surrender).  This IP address (IP ADDRESS 1) was also the same one from which the Blockchain.com interest account was opened.  As noted below, IP ADDRESS 1 was also used to access Firoz's Patel's account at a known cryptocurrency wallet services provider (Exchanger 1) 155 times between December 6, 2021, and April 26, 2021.

The first account opened by Firoz Patel at Blockchain.com was originally created in

August 2014, which is also the same time period during which the evidence indicates Payza began offering Bitcoin services on its platform.  Email Account 1 was utilized to open this account.  The phone number 514-991-4662, which is known to belong to Firoz Patel, is also associated with the Blockchain.com account.  The email address that is associated with the account was changed to vineet.tewari6032@gmail.com (Email Account 2) on July 21, 2021 (approximately five and one-half weeks after Firoz Patel surrendered to a Bureau of Prisons facility).

Between June 19, 2021 and June 23, 2021, at least six emails were traded between Email Account 2 and Blockchain.com where the owner of Email Account 2, Vineet Tewari, claimed ownership of the funds and demanded Blockchain.com return them.

Information obtained from Google indicates Email Account 2 was created using Tewari's name on June 18, 2021, just one day prior to using this email address to contact Blockchain.com and claim ownership of the bitcoin and demand its return.  The IP address utilized for the creation of the account comes back to a location in London, United Kingdom.

Based upon the evidence obtained from Blockchain.com and Google during the investigation, I believe the person who opened and controlled the account at Blockchain.com was in fact Firoz Patel, and not his father, Musa Patel.  The use of his father's name to claim ownership of the account, and subsequently Tewari's claim of ownership after Firoz Patel had reported to prison, was likely an attempt by Firoz Patel to disassociate himself from the Bitcoin, its ties to the illegal activities of Payza and Firoz Patel's efforts to conceal his money laundering activities.

I.      Blockchain.com account and claim in the United Kingdom

As noted above, after receiving responses that made no sense to their inquiries,

Blockchain.com restrained the bitcoin in question and as required by the applicable laws of the United Kingdom, disclosed the matter to the relevant authority there.  On June 23, 2021, Firoz Patel filed a claim in a Court in the United Kingdom against Blockchain Access UK seeking the return of the 450 BTC.  Neither Musa Patel nor Vineet Tewari have filed claims seeking the return of the bitcoin.

J.      Seizure of the Bitcoin in the United States

On January 11, 2022, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant to seize approximately 459.92353048 bitcoin held by Firoz Patel at Blockchain.com.

K.      The Bitcoin is Connected to Firoz Patel and Payza

As stated above, the tracing of the bitcoin transactions in this investigation was primarily completed by utilizing several bitcoin blockchain analysis tools provided by private sector blockchain analytics providers.  These providers use a cluster-based platform which analyzes transaction history as well as exposure to clusters of addresses attributed to named cryptocurrency services.

1.      Transfer of the Bitcoin to Blockchain.com

On April 27, 2021, Firoz Patel consolidated 49 unspent deposits totaling approximately 477.77 BTC in a private Bitcoin wallet beginning with 1rePbTAW (Patel Wallet) and transferred 450 BTC into the account opened at Blockchain.com in the name of Musa Patel.  Of the 49 deposits, 29 occurred between September 25, 2017, and December 20, 2017; 18 occurred between March 14, 2020, and March 3, 2021; and two occurred on April 22 and 23, 2021.  The 2017 deposits occurred while Payza was still operational; after Payza started accepting Bitcoin; and before Payza and Firoz Patel had been indicted.  The 2021 deposits occurred after Firoz

Patel had been sentenced and his self-surrender date to report to prison had been extended, but before he actually self-surrendered.

The Patel Wallet was identified in a Zendesk conversation thread[3] between Firoz Patel (portrayed to Blockchain.com as Tewari) and Blockchain.com customer support.  In that conversation, Firoz Patel told Blockchain.com to return the 450 BTC to the wallet he had sent it from, *i.e.*, the Patel Wallet.

## 2.    *Source of Funds: Firoz Patel's Personal Exchange Account*

Two deposits of note into the Patel Wallet occurred just before the Blockchain.com account was opened.  One deposit for approximately 100 BTC was conducted on April 22, 2021, and the second deposit for approximately 38.88 BTC was conducted on April 23, 2021, for a total of approximately 138.88 BTC.  These two deposits originated from a single account held at a known cryptocurrency wallet services provider (Exchanger 1).  Information obtained from Exchanger 1 reflected the account from which these deposits originated was a personal account owned by Firoz Patel that he opened on January 19, 2018. As noted earlier, IP ADDRESS 1, used to access Gmail and Blockchain.com accounts belonging to Firoz Patel, was used to access this account 155 times between December 6, 2020, and April 26, 2021, including on the dates that the bitcoin was transferred to the Patel Wallet.

## 3.    *Source of Funds: Decentralized Swaps*

Between October 27, 2017, and December 21, 2017, while Payza was still operational and after Payza started accepting Bitcoin, approximately 88.45 BTC of the Bitcoin was deposited

---

[3]        Zendesk is a software company that provides, *inter alia*, software for customer support communications.  The communications between Firoz Patel and Blockchain.com.com that occurred between April 30, 2021 and June 4, 2021, when he was seeking the return of the Bitcoin, were recorded on this software.

to the Patel Wallet from an identified cryptocurrency exchange (Exchanger 2).

Records obtained from Exchanger 2 indicate this Bitcoin was in fact the output of swaps of other cryptocurrency assets for Bitcoin using an identified decentralized exchange service (DEX).[4]  In other words, Payza dealt with other non-BTC cryptocurrency which were converted into BTC, and then deposited into the Patel Wallet. I submit that because the converted Bitcoin were sent to Firoz Patel's own wallet, that he is the one that caused the other cryptocurrencies to be converted to Bitcoin and then sent to his own wallet.  In my experience, DEXs, which often do not collect customer information or have anti-money laundering procedures in place to identify suspicious transactions, are used not only by legitimate users for privacy, but also by criminal organizations to obscure the source of illicit proceeds.

### 4.   Source of Funds: Consolidation Wallets

A large portion, approximately 123.80 BTC, of the Bitcoin was sourced to consolidation wallets 1-5. On the blockchain, consolidation wallets are sometimes used to collect payments from many different customers, or to collect funds from the victims of frauds, scams, Ponzi schemes, or other cryptocurrency-enabled crimes.  Due to the large volume of deposits observed, the presence of consolidation wallets typically indicates some type of business or illicit activity as they would almost never be utilized for personal use.

Several of the wallets that transferred bitcoin to the Patel Wallet exhibited unusual activity consistent with consolidation wallets.  For example, a wallet beginning with 14wVKxrD (Consolidation Wallet 1), transferred approximately 71.27 BTC via eight different withdrawals to the Patel Wallet between September 26, 2017 and October 5, 2017.  Consolidation Wallet 1

---

[4]     A decentralized exchange (DEX) is a platform that allows two independent parties to make cryptocurrency transactions without a third-party intermediary.

was funded by 825 deposits between the dates of April 2, 2015 and June 20, 2016(while Payza was still operational and after Payza started accepting Bitcoin).  Further tracing revealed that Consolidation Wallet 1 received deposits originating from certain cryptocurrency service providers.  The data for these deposits was obtained from three different exchanges which revealed a number of the transactions contained notes input by the account holder indicating the purpose of the transfer was to fund a Payza account.

A wallet beginning with 1CyBAvVv (Consolidation Wallet 2), transferred approximately 31.87 BTC to the Patel Wallet on September 25, 2017.  Consolidation Wallet 2 was funded by 223 deposits between May 28 and June 3, 2016 (while Payza was still operational and after Payza started accepting Bitcoin).  The wallet only made one withdrawal on September 25, 2017, to the Patel Wallet.  Further tracing revealed that Consolidation Wallet 2 received deposits originating from Exchanger 3.  The data for these deposits was obtained from Exchanger 3, which revealed a number of the transactions contained notes input by the account holder indicating the purpose of the transfer was to fund a Payza account.

A wallet beginning with 17Erha1N (Consolidation Wallet 3), transferred approximately 19.84 BTC to the Patel Wallet on September 25, 2017.  Consolidation Wallet 3 was funded by 256 deposits, all received on September 25, 2017 (while Payza was still operational and after Payza started accepting Bitcoin).  Of the 256 deposits into Consolidation Wallet 3, 246 were received from Consolidation Wallet 4 for a total of 19.40 BTC.  The wallet only made two withdrawals, both on September 25, 2017, and both to the Patel Wallet.

A wallet beginning with 1HjPGq15 (Consolidation Wallet 4) transferred approximately 0.0006 BTC to the Patel Wallet on October 5, 2017.  Consolidation Wallet 4 was funded by 475 deposits between September 17, 2014 and September 27, 2017.  Consolidation Wallet 4

made 595 withdrawals throughout this timeframe, with 319 of those withdrawals going to Coinapult. As stated above, based on emails reviewed during the investigation of Payza, Coinapult was the primary source of Payza's bitcoin when it first began offering cryptocurrency services, beginning around August 2014. Coinapult then continued to provide Bitcoin services to Payza until sometime in 2018. Of the 595 total withdrawals from Consolidation Wallet 4, 246 were sent to Consolidation Wallet 3, which were then sent to the Patel Wallet. Further tracing revealed that Consolidation Wallet 4 received deposits originating from Exchanger 3. The data for these deposits was obtained from three different exchanges which revealed a number of the transactions contained notes input by the account holder indicating the purpose of the transfer was to fund a Payza account.

A wallet beginning with 1YjaaXd3 (Consolidation Wallet 5) transferred approximately 0.82 BTC to the Patel Wallet on September 27, 2017. Consolidation Wallet 5 was funded by 7 deposits between June 22 and June 28, 2016 (while Payza was still operational and after Payza started accepting Bitcoin). The wallet only made one withdrawal on September 27, 2017, to the Patel Wallet.

The following chart summarizes the transfer information related to these consolidation wallets:

| Consolidation Wallet | Deposit Date Range | Number of Deposits | Date(s) Transferred to Patel Wallet | Number of Withdrawals | BTC Transferred to Patel Wallet |
|---|---|---|---|---|---|
| Wallet 1 | April 2, 2015- June 20, 2016 | 825 | September 26, 2017- October 5, 2017 | 388 | 71.27 BTC |
| Wallet 2 | May 28- June 3, 2016 | 223 | September 25, 2017 | 1 | 31.87 BTC |
| Wallet 3 | September 25, 2017 | 256 | September 25, 2017 | 2 | 19.84 BTC |
| Wallet 4 | September 17, 2014- September 27, 2017 | 475 | October 5, 2017 | 595 | .0006 |
| Wallet 5 | June 22- June 28, 2016 | 7 | September 27, 2017 | 1 | 0.82 BTC |
| | | | | **Total BTC to Patel Wallet:** | **123.80 BTC** |

5.   *Consolidation Wallet 6*

Finally, blockchain analysis and records for Firoz Patel's personal account at Exchanger 1 indicate that some of the funds from his Exchanger 1 account were in fact sourced from a consolidation wallet beginning with 14Nq1J2w (Consolidation Wallet 6).  On September 24, 2017, Consolidation Wallet 6 sent, via seven separate transactions, 682 BTC into the Patel Wallet.  One of those transfers was for 536 BTC.  Subsequently, on December 17, 2020 (approximately five weeks after he was sentenced), Firoz Patel conducted a transaction in which he transferred approximately 248.15 BTC.  Two hundred of those Bitcoin went to his account at Exchanger 1 and 48.15 BTC went back to the Patel Wallet as change.  On March 3, 2021, Firoz Patel conducted another transaction in which he transferred approximately 56.55 BTC.   Of this

Bitcoin, 0.39 BTC went to his account at Exchanger 1 and 56.15 BTC went back to the Patel

Wallet as change.  Both of these transfers involving the 248.15 BTC and the 56.55 BTC have

been traced back to the seven transfers of Bitcoin in September 2017 from Consolidation Wallet

6.  The 104.30 BTC (48.15 + 56.15) that was returned to the Patel wallet was a part of the 450

BTC that Firoz Patel transferred to his account at Blockchain.com.  This activity indicates that

Consolidation Wallet 6 is most likely owned and controlled by Firoz Patel.  A cluster analysis of

Consolidation Wallet 6 reveals it was funded by 1,1,836 deposits totaling approximately 803.66

BTC during the period from January 16, 2016, to November 22, 2017 (while Payza was still

operational and after Payza started accepting Bitcoin).[5]  The analysis also shows Consolidation

Wallet 6 received approximately 0.72 BTC from a service cluster that can be directly attributed

to Payza.  Further tracing revealed that Consolidation Wallet 6 received deposits originating

from other wallets that received transactions from Exchanger 3which revealed that the purpose

of the transfers were  to fund a Payza account.

Despite receiving 1,836 deposits, only nine withdrawals from Consolidation Wallet 6

were conducted.   Eight of the nine withdrawals occurred on September 24, 2017.  The fact that

Consolidation Wallet 6 received so many deposits and so few withdrawals is highly unusual for a

personal wallet.  Furthermore, cryptocurrency subject matter experts have advised me that

private, un-hosted (not tied to a cryptocurrency exchange account) wallets that exhibit

commercial behavior are typically observed in various types of online fraud scams and Ponzi

schemes.  These were the same types of merchants to whom Payza was known to illegally

provide payment and money transfer services.

Further tracing of the bitcoin transferred into Consolidation Wallet 6 revealed it received

---

[5]         The average of those 1836 deposits therefore would have been 0.4379 BTC.

multiple deposits that originated from known dark web criminal enterprises. For example, one deposit was for approximately 0.45 BTC and occurred on March 5, 2016. This deposit originated from a known online scam called Recyclix.com. A second deposit was for approximately 0.21 BTC and occurred on April 19, 2016. This deposit originated from an account known to be associated with a site called Dark Scandals that was involved in selling child abuse material on the dark web. These deposits were both received by Consolidation Wallet 6 indirectly via two intermediary wallets, but the intermediary wallets conducted the transactions within hours of being sent from the illicit markets. This behavior is typical of darknet market vendors who cash out illicit proceeds using services like Payza, during which they send bitcoin through one or more private wallet addresses and wait some period of time before depositing funds into a service like Payza. This transaction pattern is intended to put distance between the deposit and the source of funds.

6.      *Source of Funds: Funds Tied to Payza's Service Wallet*

Service Provider's Wallets are typically wallets that have been attributed by blockchain analysis tools to companies that provide online cryptocurrency services. The Payza Service Cluster in the blockchain analysis tool was active on the Bitcoin Blockchain from August 8, 2014 to October 18, 2021 (which includes the time period while Payza was still operational and after Payza started accepting Bitcoin). These observed dates indicate that Payza was still operational for over three years after Firoz Patel was indicted and for at least four months after he self-surrendered to U.S. authorities to serve his prison sentence. During this time period, a total of approximately 37,401 transfers were received and approximately 81,569 transfers were sent from Bitcoin addresses attributed directly to Payza. A review of Payza's website by HSI agents on March 27, 2015, clearly showed that customers could use Bitcoin as a method of

adding and withdrawing funds from a Payza account.  I submit that these facts establish that Payza was extensively utilizing Bitcoin while Payza was operational.  The Payza Service Cluster sent approximately three transfers totaling 59.72 BTC to the Patel Wallet from September 25-27, 2017.  Two of the three transfers, totaling 0.24 BTC went directly into the Patel wallet and into the 450 transfer.  The remaining 59.48  BTC were comingled with additional funds in the Patel Wallet and sent out as a transaction of 118.48 BTC to Firoz Patel's Exchanger 1 account (100 BTC were sent to Exchanger 1 and 18.48 BTC were returned to the Patel Wallet as change).  The 18.48 BTC change was later sent from the Patel Wallet as part of the 450 BTC transferred to Blockchain.com on April 27, 2021, by Firoz Patel.

       7.     *Payza's Bitcoin Services*

As stated previously, it appears Payza first began offering cryptocurrency services around August 2014.  Payza primarily utilized a Panama based cryptocurrency services provider called Coinapult in order to obtain bitcoin whenever a customer wanted to load their Payza account in this manner.  Based on emails reviewed during the original investigation into Payza, Coinapult was the primary source of Payza's bitcoin when it first began offering cryptocurrency services.  Furthermore, blockchain analysis reveals significant interaction between the Payza Service Cluster, Consolidation Wallets 1 and 4, and Coinapult.

On September 5, 2017, Payza publicly announced through a press release that it would start giving customers full control of the Bitcoin wallets they used for interacting with Payza.  Prior to this, if a customer wanted to deposit or withdraw Bitcoin, they had to first deposit the funds into their Payza account.  After depositing the funds, Payza itself would then purchase the Bitcoin from Coinapult.  Once this process was complete, Payza would make the Bitcoin available to the customer.  The problem with this process from the customer's perspective was

that since Payza was acquiring the Bitcoin from the provider, it meant that Payza controlled the wallet to which the Bitcoin was deposited and could take the funds at any time if they chose to do so.  Payza maintained full control of the Bitcoin instead of the customer.  This also explains why activity attributed to the Payza cluster on the blockchain significantly declined once users had full control of their wallets.

Starting approximately three weeks later, on September 24, 2017, and continuing for the next three months, a majority of the 450 bitcoin was consolidated into both the Patel Wallet and Firoz Patel's personal account at Exchanger 1.  See Chart, *infra* at 37.

Several petitions received by the U.S. Department of Justice from victims claiming to have lost Bitcoin they had on deposit at Payza reflect transaction dates that occurred between September 2018 and November 2018, which was at least six months after Payza was indicted and shut down by the U.S. Department of Homeland Security and the United States Attorney's Office for the District of Columbia.  Blockchain analysis also reflects Bitcoin transactions have occurred in wallets attributed to Payza as recently as October 2021, four months after Patel reported to prison.  This evidence shows that despite the indictments, convictions, and forfeiture actions taken against Firoz Patel and Payza by U.S. government authorities, Payza continued to operate as an unlicensed money transfer business in violation of U.S. law, and Firoz Patel continued to launder his ill-gotten proceeds.

As part of Firoz Patel's plea agreement, he was required to disclose all known assets to the U.S. government.  Based on the transactional activity observed in the blockchain, particularly the transfers that took place between the time when Patel was sentenced and when he reported to prison, it is clear that Firoz Patel not only knew about the bitcoin discussed above, but willfully chose not to disclose them.  Based on the evidence obtained in this case, it is likely that Firoz

Patel did not disclose these assets because he knew they were derived from Payza's illicit activity and would therefore have been subject to forfeiture.

During the investigation, HSI reviewed tens of thousands of emails, reviewed countless documents, and interviewed numerous witnesses.  At no point was there any indication or revelation that Firoz Patel may have been engaged in employment outside of Payza or possessed an income stream that was not related to Payza in some manner. Accordingly, I submit that the entirety of the 450 Bitcoin can be traced back to the time period that Firoz Patel was running Payza and the illegal activity of Payza is the source of the Bitcoin.

L.     Summary of Transfers of the Bitcoin to Patel Wallet

The following chart summarizes the Dates, Descriptions, Amounts and Percentages of the Bitcoin transfers:

| Section Above | Date(s) | Description | Amount of Bitcoin |
|---|---|---|---|
| 2 | April 22-23, 2021 | Transfer from Firoz Patel's Personal Account at Exchanger 1 | 138.88 |
| 3 | October 27, 2017 – December 21, 2017 | Conversion of Other Cryptocurrencies to Bitcoin (Exchanger 2) | 88.45 |
| 4 | September 252017-October 5, 2017 | Transfers from Consolidation Wallets 1-5 | 123.80 |
| 5 | September 24, 2017 | Transfers from Consolidation Wallet 6 | 104.31 |
| 6 | September 25, 2017-April 27, 2021 | Transfer from Payza Service Cluster | 18.72 |
| **TOTALS** | | | **474.16** |
| | September 27, 2017 – March 3, 2021 | Other transfers | 3.6 |
| | | | **477.76** |
| | April 27, 2021 | Change returned to the Patel Wallet after transfer to Blockchain.com | -27.76 |
| | | | **450 BTC** |

L.    <u>Conclusion</u>

Based on the information provided in this affidavit, there is probable cause to believe the Bitcoin transferred to Blockchain.com is owned by Firoz Patel and was derived directly from Payza's illicit business operations as an unlicensed money transfer service and its money laundering operation.

Based on the above facts, Patel's depositing of the Bitcoin into the Blockchain.com account constituted a violation of Title 18 U.S.C Sections 1956(a)(1)(B)(i) (concealment money laundering) and 1957 (expenditure money laundering), and gives rise to forfeiture of property traceable to the crime as well as "clean" property involved in the crime. There is also probable cause to believe that the Bitcoin represents funds which were involved in the commission of wire fraud and in the operation of an unlicensed money transmission business, as well as funds commingled with fraud and other illegal proceeds that flowed through Payza due to its purposeful lack of due diligence of its customers.  This type of activity occurred throughout the entire period during which Payza was operational.

I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for an Arrest Warrant.

Respectfully submitted,

*Eugene Sveum*

Eugene Sveum
Special Agent
Homeland Security Investigations

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on April 25, 2023.

HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE