**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : |
| | : |
| | : |
| **v.** | : |
| | : **Criminal No. 23-cr-166 (RMM/DLF)** |
| **FIROZ PATEL,** | : |
| | : |
| **Defendant.** | : |
| | : |

**MOTION FOR EMERGENCY STAY AND FOR**
**<u>REVIEW AND APPEAL OF RELEASE ORDER</u>**

COMES NOW, the United States of America, by and through its Attorney, the United States Attorney for the District of Columbia, and respectfully moves this Court, first, to stay Defendant Firoz Patel's release pending trial,[1] and second, to hear an appeal to review and overturn the Magistrate Judge's denial of the Government's motion for pretrial detention.   In support whereof, the government states as follows:

**<u>PROCEDURAL BACKGROUND</u>**

On April 25, 2023, the defendant, Firoz Patel, was charged by Complaint (ECF No. 1) with Laundering of Monetary Instruments in violation of 18 USC § 1956(a)(1)(B)(i) and Engaging in Monetary Transactions in Property Derived from Unlawful Specified Activity in violation of 18 U.S.C. § 1957.   On or about April 27, 2023, the defendant was presented before a United States Magistrate Judge in the District of Massachusetts on the Criminal Complaint and was ordered to be transported to the District of Columbia.   On May 11, 2023, a grand jury indicted the defendant on the same two charges.

---

[1] The government has requested that the Magistrate Judge stay her release order until this Court rules on this appeal.   However, as of the date and time of this filing, the Magistrate Judge has not ruled upon that request.

At the defendant's initial appearance in the United States District Court for the District of Columbia on May 17, 2023, the government moved for detention pending trial under 18 U.S.C. § 3142(f)(2)(A). Additionally, the government filed a memorandum in support of pretrial detention on May 19, 2023, ECF No. 11, and the defense filed an opposition on the same day, ECF No. 14.

On May 22, 2023, a detention hearing was held before Magistrate Judge Robin Meriweather.   At the hearing, counsel for both parties supplemented their briefs with oral argument.   At the conclusion of the hearing, Judge Meriweather denied the government's request to detain the defendant pending trial and released the defendant to his home in Canada with several conditions.   The Court determined that the first factor under 18 U.S.C. § 3142(g), the nature and circumstances of the offense, weighed in favor of detention.   Similarly, the Court concluded that the second 3142(g) factor, the weight of the evidence, was strong and also weighed in favor of detention.   The Court concluded however, that the third 3142(g) factor, the history and characteristics of the defendant, was mixed.   The Court noted that the defendant was not a citizen of the United States and did not have ties to the community.   The Court also noted that the defendant had access to cryptocurrency wallets and bank accounts in other countries that total millions of dollars and he could use those funds to finance his flight from prosecution.   The Court considered the defendant's prior compliance in his earlier case in this jurisdiction, discussed below, and concluded that this factor slightly favored the defendant.   The Court reasoned that because the default position is release of a defendant, it could formulate release conditions, and did so.

**FACTUAL BACKGROUND**

On November 10, 2020, the defendant Firoz Patel was sentenced to 36 months of imprisonment for his role in operating Payza, an illegal online money transmitting business

2

responsible for transmitting more than $250 million in transactions.   As part of his sentence, the defendant agreed to forfeit $4,620,459.45 in funds seized from Payza, as well as "any property, real or personal," that was "involved in" the operation of Payza.   The defendant eventually self-surrendered to prison on June 11, 2021.   But in the period between his sentencing and self-surrender, on April 27, 2021, the defendant transferred exactly 450 Bitcoin (BTC)[2] derived from Payza's operations—valued at $24,020,699.83 at the time—into a sham account opened under his father's name.   The defendant did so in order to conceal and shield those Payza-derived funds from forfeiture in his criminal case while he served his sentence.

## A.  Payza Background

As described in the Affidavit in support of the Criminal Complaint sworn out by Homeland Security Investigations (HSI) Special Agent Eugene Sveum, ECF No. 1-1, which is incorporated by reference herein, the online payment processor MH Pillars Ltd., doing business as Payza, was an unlicensed money services business used by criminals as a conduit to launder illicit proceeds. In particular, Payza was used to launder the proceeds of numerous Ponzi schemes.   Payza became a preferred platform for illicit transactions due to its weak Know-Your-Customer (KYC) policy and compliance program that failed to weed out bad actors.   At its peak, the volume of illicit

---

[2]  The virtual currency bitcoin (abbreviated "BTC") is a form of value that is able to be transacted over the Internet using Bitcoin software.   "This software permits users to create 'Bitcoin addresses,' roughly analogous to anonymous accounts, and to securely transfer bitcoin from one Bitcoin address to another.   The identity of a Bitcoin address owner is generally anonymous, although law enforcement can often identify the owner of a particular Bitcoin address by analyzing the blockchain, which is essentially a distributed public ledger that keeps track of all Bitcoin transactions, incoming and outgoing, and records every address that has ever received a bitcoin and maintains records of every transaction."   *United States v. Sterlingov*, 573 F. Supp. 3d 28, 31 (D.D.C. 2021) (cleaned up).

proceeds moving through the Payza system was hundreds of millions of dollars annually.    Payza was based in Canada, but it transmitted funds on behalf of users throughout the United States without necessary state money transmitting licenses.    Payza was operated by the defendant in this case, Firoz Patel, and by his brother, Ferhan Patel.

### B.   Guilty Plea, Forfeiture Order, and Voluntary Surrender in the Payza Case

On March 18, 2018, a federal grand jury in the District of Columbia returned an indictment against MH Pillars Ltd., d/b/a Payza, Firoz Patel, and Ferhan Patel, on charges of Conspiracy, in violation of 18 U.S.C. § 371; Operating an Unlicensed Money Transmission Business, in violation of 18 U.S.C. § 1960(a); Conspiracy To Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); and Money Transmitting Without a License, in violation of D.C. Code § 26-1001.   *See United States v. MH Pillars Ltd., et al.*, No. 18-cr-53, ECF No. 1 (Indictment).    The charges in the indictment arose from Payza's transmission of funds with intent to promote the carrying on of unlicensed money transmission and illegal wire fraud schemes, such as pyramid schemes and Ponzi schemes; and from Payza's operation in the District of Columbia without the necessary D.C. money transmitting license.

During the pendency of the Payza case, the defendant was released on his personal recognizance and allowed to remain in Canada subject to basic conditions of release.

On July 16, 2020, the defendant entered a guilty plea pursuant to a written plea agreement to a Superseding Information charging one count of Conspiracy under 18 U.S.C. § 371, with objects including operating an unlicensed money transmitting business and international promotional money laundering, in violation of 18 U.S.C. § 1960 and 18 U.S.C. § 1956(a)(2)(A). *MH Pillars Ltd.*, No. 18-cr-53, ECF No. 81 (Information).    As part of his plea agreement, the

defendant agreed to forfeiture of more than $4.6 million in seized "Payza funds," and to "any property, real or personal, involved in the offense to which [the defendant] was pleading guilty." *MH Pillars Ltd.*, No. 18-cr-53, ECF No. 90 (Plea Agreement), at 11; *see* 18 U.S.C. § 982(a)(1) (providing for forfeiture of "any property, real or personal, involved in" any violation of 18 U.S.C. §§ 1956, 1957, or 1960).   The defendant also promised "to take all necessary actions to identify all assets over which [he] exercises or exercised control, directly or indirectly, at any time since November 2012 or in which your client has or had during that time any financial interest." *MH Pillars Ltd.*, No. 18-cr-53, ECF No. 90, at 12.

On November 17, 2020, then-District Judge Ketanji Brown Jackson sentenced the defendant to 36 months of imprisonment to be followed by 24 months of supervised release.   *MH Pillars Ltd.*, No. 18-cr-53, ECF No. 136 (Judgment).   She also entered a forfeiture order ordering the forfeiture of "any property, real or personal, involved in the commission of Count One, and any property traceable to such property," as well as the forfeiture of $4,620,459.45 in seized "Payza funds."   *Id.*, ECF No. 132 (Final Consent Order of Forfeiture), at 4.

On February 4, 2021, the defendant moved to delay his self-surrender date by several months, citing health concerns arising from ongoing COVID-19 pandemic.   *Id.*, ECF No. 141. The Court granted the extension, and then granted a second extension based on difficulties encountered when the defendant attempted to enter the country from Canada.   *See id.*, ECF Nos. 144, 146, 147.   The defendant eventually self-surrendered to Bureau of Prisons custody on June 11, 2021.

### C.  Laundering of 450 BTC in Payza Funds Subject to Forfeiture

On April 25, 2021, an interest-bearing account was opened in the name of Musa Patel, the defendant's father, at Blockchain.com.   Blockchain.com is a virtual currency exchange based outside the United States with operations in the United Kingdom.    The account was opened using the defendant's phone number (ending in 4662) and the defendant's email address (fijmeister@gmail.com).    The account was registered to an address in Belize City, Belize; the same address in Belize was used by the defendant to incorporate at least six different shell companies in connection with his operation of Payza.    The account was initially accessed from an Internet Protocol (IP) address that resolved to Canada, where the defendant was residing.

Two days later, on April 27, 2021, a deposit of 450 BTC (valued at $24,020,699.83) was made into the Blockchain.com account.    As described in further detail below, the 450 BTC was traced to proceeds from the operation of Payza.

On April 30, 2021, Blockchain.com sent an email to fijmeister@gmail.com, the email address associated with the account, asking for more information about the nature and purpose of the deposit.   Blockchain.com had flagged the transaction due to a number of irregularities.

Later on the same day, April 30, 2021, Blockchain.com received a response from the fijmeister@gmail.com email address.    Google account records show that this address was registered in the name of "Fij Patel," but it was registered using the defendant's phone number (ending in 4662), and Google Pay records confirm the address was linked to the defendant at his address in Quebec, Canada:

```
Google Confidential & Proprietary

CUSTOMER PROFILE DETAILS

Payments Profile ID: ████████
Contact Email Address: fijmeister@gmail.com
Owner Email Address: fijmeister@gmail.com
Payments Profile Creation: 2014-01-23 22:36:59 UTC

ADDRESSES

BILLING,LEGAL,TAX,SHIPPING,DEFAULT

Firoz Patel
```



```
QC
```

```
CA
```

```
          -4662
```

Although the Blockchain.com account was opened in the name of Musa Patel (the defendant's father), the April 30, 2021 response purported to be from an individual named "Vineet Tewari."   Vineet Tewari is the name of an employee of Payza's branch in India called Crescent Business Solutions Private Limited, d/b/a Crescent Payments Private Limited.   The defendant's use of "Vineet Tewari" here is consistent with his prior use of Payza employees to open businesses and take actions to violate the law.   When asked to explain why the account was registered under a different name—just five days earlier—someone using the name "Vineet Tewari" responded: "That was the name of the person who setup the account in first place.   There was no way to change the name before I took over to my name for verification."   When asked about the origin of the funds, "Vineet Tewari" stated:

> The crypto currency was transferred from my friend's account, also at Blockchain.com who has loaned me the BTC to earn extra with.   The BTC was purchased in years before (2015-2016) and was sitting in his Blockchain account for a few years, before it was then transferred to Binance to trade with, and then the extra brought back to Blockchain.

7

As explained below, that explanation was false, and the funds were instead traced to Payza proceeds that were funneled into Bitcoin wallets controlled by the defendant.   Without receiving adequate explanation, Blockchain.com eventually decided to freeze the customer account.

Correspondence continued between Blockchain.com and the fijmeister@gmail.com email address from April 30, 2021 until June 4, 2021.   As noted above, the defendant self-surrendered to a Bureau of Prisons facility on June 11, 2021.   Google account records for the fijmeister@gmail.com email address show that it was accessed at least 93 times during this time period.   The majority of logins came from an IP address that resolves to Quebec, Canada—where the defendant was residing prior to his self-surrender.   The same IP address in Quebec, Canada was used to access the defendant's account (in his true name) at another virtual currency exchange 155 times between December 6, 2021 and April 26, 2021.

By early June, with the defendant's self-surrender imminent, the tone of the messages from fijmeister@gmail.com became increasingly confrontational.   In one of the final messages, on June 2, 2021, fijmeister@gmail.com demanded that Blockchain return the frozen funds—and signed the message with the initial "F," the customary sign-off used by the defendant Firoz Patel in other email messages.

---

**Fijmeister**   June 2, 2021 at 10:09 PM
Azu,

Or whoever is reading this.  I need immediate support.  I think I have been phished for some details on our accounts.  Due to your non-response for so long, I was chatting with https://blockchainhelpdesk.support/.

I NEED IMMEDIATE SUPPORT REGARDING THIS!

You will send the BTC to a new wallet address now.  I dont trust this wallet anymore.

New address is:
bc1q4tdgq7q30kn2hj4rru04x7qtacpnt32mgs7mg4

After another day of non-responsiveness, I am now stating a new fact.  A lawyer in London has been contacted to pursue this with Blockchain.  We will now be making demands on the immediate release of the BTC.  Failing that we will be making claims in the USA against your bonds for the state licensing.  As well against FCA in UK.

Your company is worth billions.  There is no use in continuing this type of business and theft.  Blockchain has no right to keep my funds.

If this is about me, then realize that I am not beholden to any actions by USA or any other government authorities.  I have paid my dues and I owe nothing to anybody.  Any thought that I am involved in Money Laundering is simply wrong as any claims to that effect will be fought by me vigorously.  You are not in any position or authority to make any judgement or claim to the contrary.

Do the right thing immediately.  This is the last email from me on this matter.

F

Following the defendant's self-surrender on June 11, 2021, correspondence with Blockchain.com shifted to a second email address, vineet.tewari6032@gmail.com.   Google account records indicate that this email address was created on June 18, 2021.   Between June 19, 2021 and June 23, 2021, at least six emails were traded between this email address and Blockchain.com in which Vineet Tewari claimed ownership of the 450 BTC and demanded that Blockchain.com unfreeze the account and return the funds.

Finally, on June 23, 2021, the defendant filed a claim in his own name in a court in the United Kingdom against Blockchain Access UK (*i.e.*, Blockchain.com), abandoning the pretense that the funds belonged to anybody else.

On January 11, 2022, a United States Magistrate Judge for the United States District Court for the District of Columbia issued a seizure warrant for the BTC held by Firoz Patel at Blockchain.com.

### A. Seizure and Tracing of the 450 BTC to Payza's Operations

#### 1. Payza's Bitcoin Services

As described in the Complaint Affidavit, Payza began offering cryptocurrency services in or around August 2014.   Payza primarily utilized a Panama based cryptocurrency services provider called Coinapult in order to obtain bitcoin whenever a customer wanted to load their Payza account in this manner.   Based on emails reviewed during the original investigation into Payza, Coinapult was the primary source of Payza's bitcoin when it first began offering cryptocurrency services.

On September 5, 2017, Payza publicly announced through a press release that it would start giving customers full control of the Bitcoin wallets they used for interacting with Payza.   Prior to this, if a customer wanted to deposit or withdraw Bitcoin, they had to first deposit the funds into their Payza account.   After depositing the funds, Payza itself would then purchase the Bitcoin from Coinapult.   Once this process was complete, Payza would make the Bitcoin available to the customer.   The problem with this process from the customer's perspective was that since Payza was acquiring the Bitcoin from the provider, it meant that Payza controlled the wallet to which the Bitcoin was deposited and could take the funds at any time if they chose to do so.   Payza maintained full control of the Bitcoin instead of the customer.

Several petitions received by the U.S. Department of Justice from victims claiming to have lost Bitcoin they had on deposit at Payza reflect transaction dates that occurred between September 2018 and November 2018, which was at least six months after Payza was indicted and shut down. Blockchain analysis also reflects Bitcoin transactions have occurred in wallets attributed to Payza as recently as October 2021, four months after the defendant reported to prison.

10

### 2. Tracing of the 450 BTC to Payza

As described in the Complaint Affidavit, on April 27, 2021, the defendant consolidated 49 unspent deposits totaling approximately 477.77 BTC into a private Bitcoin wallet[3] beginning with 1rePbTAW[4] (the "Patel Wallet") and transferred 450 BTC into the account opened at Blockchain.com in the name of Musa Patel.   Of the 49 deposits, 29 occurred between September 25, 2017, and December 20, 2017; 18 occurred between March 14, 2020, and March 3, 2021; and two occurred on April 22 and 23, 2021.   The 2017 deposits occurred while Payza was still operational; after Payza started accepting Bitcoin; and before Payza and the defendant had been indicted in the Payza case.   The 2021 deposits occurred after the defendant had been sentenced and his self-surrender date to report to prison had been extended, but before he actually self-surrendered.

When "Vineet Tewari" demanded that Blockchain.com return the 450 BTC, he initially asked that the funds be transferred back to the wallet from which it had been sent, *i.e.*, the Patel Wallet.   He later provided a different wallet address to receive the 450 BTC.

---

[3]  The storage of virtual currency is typically associated with an individual "wallet," which is similar to a virtual account.   Wallets are used to store and transact in virtual currency.   A wallet may include many virtual currency addresses, roughly equivalent to anonymous account numbers. Wallets may be "hosted" or "unhosted."   A "hosted" wallet is an "account held by a third party financial-institution, known as a cryptocurrency exchange."   *In the Matter of the Search of One Address in Washington, D.C., Under Rule 41*, 512 F. Supp. 3d 23, 26 (D.D.C. 2021).   An "unhosted" wallet, sometimes referred to as a private wallet or a non-custodial wallet, is a wallet held exclusively by the private owner of the bitcoin.   *See id.*   Thus, "BTC in an unhosted wallet is like cash in a personal safe or hidden under the mattress, while BTC in a hosted wallet is like money in a bank account."   *Id.* at 26 n.3.

[4]  BTC wallets or clusters are customarily referred to by the first several characters of the BTC address associated with the wallet or cluster.   That practice is followed here.

11

Blockchain analysis described in further detail in the Complaint Affidavit traced the funds in the Patel Wallet to several principal sources which, in turn, appear to be derived from Payza's operations.

First, two deposits occurred in April 2021 totaling approximately 138.88 BTC.   These two deposits originated from a single account held at a known cryptocurrency wallet services provider (Exchanger 1).   Information obtained from Exchanger 1 reflected the account from which these deposits originated was a personal account owned by Firoz Patel that he opened on January 19, 2018.

Second, between October 27, 2017, and December 21, 2017, while Payza was still operational and after Payza started accepting Bitcoin, approximately 88.45 BTC of the Bitcoin was deposited to the Patel Wallet from an identified cryptocurrency exchange (Exchanger 2). Records obtained from Exchanger 2 indicate this Bitcoin was in fact the output of swaps of other cryptocurrency assets for Bitcoin using an identified decentralized exchange service (DEX).[5]   In other words, Payza dealt with other non-BTC cryptocurrency which were converted into BTC, and then deposited into the Patel Wallet.   DEXs, which often do not collect customer information or have anti-money laundering procedures in place to identify suspicious transactions, are used not only by legitimate users for privacy, but also by criminal organizations to obscure the source of illicit proceeds.

Third, a large portion, approximately 123.80 BTC, of the Bitcoin was sourced to consolidation wallets, designated during the investigation as Consolidation Wallets 1-5. On the

---

[5] A decentralized exchange (DEX) is a platform that allows two independent parties to make cryptocurrency transactions without a third-party intermediary.

blockchain, consolidation wallets are sometimes used to collect payments from many different customers, or to collect funds from the victims of frauds, scams, Ponzi schemes, or other cryptocurrency-enabled crimes.   Due to the large volume of deposits observed, the presence of consolidation wallets typically indicates some type of business or illicit activity as they would almost never be utilized for personal use.

Several of the wallets that transferred bitcoin to the Patel Wallet exhibited unusual activity consistent with consolidation wallets.   For example, a wallet beginning with 14wVKxrD (Consolidation Wallet 1), transferred approximately 71.27 BTC via eight different withdrawals to the Patel Wallet between September 26, 2017 and October 5, 2017.   Consolidation Wallet 1 was funded by 825 deposits between the dates of April 2, 2015 and June 20, 2016 (while Payza was still operational and after Payza started accepting Bitcoin).   Further tracing revealed that Consolidation Wallet 1 received deposits originating from certain cryptocurrency service providers.   The data for these deposits was obtained from three different exchanges which revealed a number of the transactions contained notes input by the account holder indicating the purpose of the transfer was to fund a Payza account.   Similarly, records related to Consolidation Wallets 2 and 4 also indicated that they originated with transfers intended to fund Payza accounts.

Fourth, blockchain analysis and records for Firoz Patel's personal account at Exchanger 1 indicate that some of the funds from his Exchanger 1 account were in fact sourced from a consolidation wallet beginning with 14Nq1J2w (Consolidation Wallet 6).   This wallet received several deposits from the defendant's account at Exchanger 1, indicating that Consolidation Wallet 6 is most likely owned and controlled by Firoz Patel.   A cluster analysis of Consolidation Wallet 6 reveals it was funded by 1,836 deposits totaling approximately 803.66 BTC during the period

from January 16, 2016, to November 22, 2017 (while Payza was still operational and after Payza started accepting Bitcoin).   The analysis also shows Consolidation Wallet 6 received approximately 0.72 BTC from a service cluster that can be directly attributed to Payza.

Despite receiving 1,836 deposits, only nine withdrawals from Consolidation Wallet 6 were conducted.   Eight of the nine withdrawals occurred on September 24, 2017.   The fact that Consolidation Wallet 6 received so many deposits and so few withdrawals is highly unusual for a personal wallet.   Private, un-hosted (not tied to a cryptocurrency exchange account) wallets that exhibit commercial behavior are typically observed in various types of online fraud scams and Ponzi schemes.   These were the same types of merchants to whom Payza was known to illegally provide payment and money transfer services.

Further tracing of the bitcoin transferred into Consolidation Wallet 6 revealed it received multiple deposits that originated from known dark web criminal enterprises.   For example, one deposit was for approximately 0.45 BTC and occurred on March 5, 2016.   This deposit originated from a known online scam called Recyclix.com.   A second deposit was for approximately 0.21 BTC and occurred on April 19, 2016.   This deposit originated from an account known to be associated with a site called Dark Scandals that was involved in selling child abuse material on the dark web.   These deposits were both received by Consolidation Wallet 6 indirectly via two intermediary wallets, but the intermediary wallets conducted the transactions within hours of being sent from the illicit markets. This behavior is typical of darknet market vendors who cash out illicit proceeds using services like Payza, during which they send bitcoin through one or more private wallet addresses and wait some period of time before depositing funds into a service like Payza. This transaction pattern is intended to put distance between the deposit and the source of funds.

And finally, fifth, a significant amount of Bitcoin was traced to wallets associated with Payza itself (the "Payza Service Cluster").   Service provider's wallets are typically wallets that have been attributed by blockchain analysis tools to companies that provide online cryptocurrency services.   The Payza Service Cluster in the blockchain analysis tool used in this investigation was active on the Bitcoin Blockchain from August 8, 2014 to October 18, 2021 (which includes the time period while Payza was still operational and after Payza started accepting Bitcoin).   These observed dates indicate that Payza was still operational for over three years after the defendant was indicted and for at least four months after he self-surrendered to U.S. authorities to serve his prison sentence.   During this time period, a total of approximately 37,401 transfers were received and approximately 81,569 transfers were sent from Bitcoin addresses attributed directly to Payza.   A review of Payza's website by HSI agents on March 27, 2015, showed that customers could use Bitcoin as a method of adding and withdrawing funds from a Payza account.   The Payza Service Cluster sent approximately three transfers totaling 59.72 BTC to the Patel Wallet from September 25-27, 2017.   Two of the three transfers, totaling 0.24 BTC went directly into the Patel Wallet and into the 450 BTC transfer.   The remaining 59.48 BTC were comingled with additional funds in the Patel Wallet and sent out as a transaction of 118.48 BTC to Firoz Patel's Exchanger 1 account (100 BTC were sent to Exchanger 1 and 18.48 BTC were returned to the Patel Wallet as change).   The 18.48 BTC change was later sent from the Patel Wallet as part of the 450 BTC transferred to Blockchain.com on April 27, 2021, by Firoz Patel.

**APPLICABLE LAW**

Title 18, U.S.C. § 3145(a) states:

> **(a) Review of a release order –** If a person is ordered released by a magistrate, . . .
>
> > **(1)** the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the Government's motion to review a release order, this Court considers *de novo* the Magistrate Judge's denial of pretrial detention.   Although the D.C. Circuit "ha[s] not squarely decided the issue," *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), every other circuit to have analyzed the issue has concluded the standard is *de novo*. *See United States v. Blackson*, No. 23-cr-25 (BAH), 2023 U.S. Dist. LEXIS 18988, at *15 n.2 (D.D.C. Feb. 6, 2023) (collecting Court of Appeals cases from the First, Second, Third, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that support this proposition).

In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not raised previously.   In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Under the Bail Reform Act, the Court "shall order" the defendant to be detained if it determines after a hearing that no condition or combination of conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).

A finding of either danger to the community or risk of flight is sufficient for detention. *See United States v. Ferranti*, 66 F.3d 540, 543-44 (2d Cir. 1995). If the basis for detention is risk of flight, the government must prove that the defendant presents a risk of flight only by a preponderance of the evidence. *United States v. Vortis*, 785 F.2d 327, 328-29 (D.C. Cir. 1986); *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). The government may present evidence by way of proffer, *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996), and "[t]he rules concerning admissibility of evidence in criminal trials do not apply" at a detention hearing, 18 U.S.C. § 3142(f).

In considering whether there are conditions of release which will reasonably assure the safety of any other person and the community, and the appearance of the defendant as required, the Court should consider and weigh the following factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). As set forth more fully below, these factors weigh in favor of detaining the defendant.

---

**ARGUMENT**

Each of the § 3142(g) factors weighs in favor of detention.   The defendant executed a complex scheme to conceal illicit cryptocurrency proceeds valued at more than $24 million.   He did so knowing that funds involved in Payza's operation were subject to forfeiture in his criminal case.   The defendant's brazen defiance of the Court's authority in attempting to shield Payza proceeds from forfeiture, and the aggravating factor that the crime was committed while the defendant was on release pending completion of his sentence, weighs heavily against pretrial release.   Combined with the defendant's foreign citizenship, lack of ties to the United States, and suspected access to unsecured cryptocurrency assets, pretrial detention is necessary to ensure that the defendant does not flee to evade prosecution.

**A.  The Nature and Circumstances of the Offense**

As described in the Complaint affidavit, the defendant executed a complex scheme to conceal 450 BTC valued at more than $24 million from forfeiture in the Payza prosecution.   He utilized layers of deception, including a false name (Musa Patel, the defendant's father), an address in Belize previously used for numerous shell companies affiliated with Payza, a false and misleading explanation for the origin of the 450 BTC used in the transaction, and the apparent involvement of an overseas confederate, Vineet Tewari, a former Payza employee located in India (and/or alternatively, the use of Vineet Tewari's identity to further the offense).   The sophistication and deceptiveness of the defendant's scheme weighs in favor of pretrial detention. *See, e.g.*, *United States v. Otunyo*, 2020 WL 2065041, at *4 (D.D.C. Apr. 28, 2020) (finding pretrial detention appropriate in part because defendant "took elaborate steps to conceal his own role" in fraud schemes, "including by recruiting others to assist, and creating . . . shell companies,

and fraudulent accounts"); *United States v. Bikundi*, 47 F. Supp. 3d 131, 134-35 (D.D.C. 2014) (finding pretrial detention appropriate in part because defendant "had the sophistication to set up several companies" used in the offense and participated in "quite complex" fraud scheme).

The defendant did so for brazenly dishonest motives.   He orchestrated the scheme while asking his sentencing court to delay his self-surrender date, ostensibly due to COVID-19 concerns. He did so knowing full well that the 450 BTC, if discovered, would be subject to forfeiture.   As his plea and sentencing paperwork made clear, the government had seized and forfeited more than $4.6 million in "Payza funds," and was seeking forfeiture of any property "involved in" the money laundering and unlicensed money transmitting conspiracy to which the defendant had pled guilty. And he did so knowing that, pursuant to his forfeiture obligations, he was required to "identify all assets over which [he] exercises or exercised control, directly or indirectly, at any time since November 2012."   *MH Pillars Ltd.*, No. 18-cr-53, ECF No. 90 (Plea Agreement), at 12.   The defendant's willful defiance of his plea and forfeiture obligations raises significant doubt about his ability to abide by any conditions of release that might be set by the Court.

Further, the defendant's crimes expose him to heavy punishment.   He faces up to 20 years in prison on Count One, *see* 18 U.S.C. § 1956(a)(1); and 10 years in prison on Count Two, *see id.* § 1957(b)(1).   Unlike his first sentencing in the Payza case, where he appeared as a defendant with no prior criminal record, he is now a convicted felon who already received a 36-month sentence of imprisonment.   Under U.S.S.G. § 4A1.1(a), he would receive 3 criminal history points for this sentence, placing him in at least Criminal History Category II, which would elevate

the recommended sentencing range under the Sentencing Guidelines.[6]   Although the government

can only offer a rough estimate of the sentencing Guidelines that will apply at sentencing, any

laundering offense involving more than $24 million in funds, under Criminal History Category II,

would expose the defendant to a substantial term of imprisonment.[7]

In addition, the money laundering offense charged in Count One exposes the defendant to

"a fine of not more than $500,000 or twice the value of property involved in the transaction,

whichever is greater," 18 U.S.C. § 1956(a)(1)—meaning that the defendant could be fined up to

twice the value of the $24 million in BTC that he illegally concealed, or more than $48 million.

---

[6] The defendant would likely receive an additional two criminal history points under U.S.S.G. § 4A1.1(d) because he committed the offenses "while under any criminal justice sentence." *See*, R. Haines *et al*., Federal Sentencing Guidelines Handbook, Vol. 2, 2022-2023 Edition at 223 (2022) ("Similarly, the fact that the defendant . . . has not yet surrendered to serve his sentence does not change the fact that he is under a criminal justice sentence.").   With a total of 5 criminal history points, the defendant would be moved into Criminal History Category III, further increasing his likely sentencing range under the Guidelines.

[7] For Count One, the defendant's offense level would be calculated pursuant to U.S.S.G. § 2S1.1(a)(1) because the defendant committed the underlying money laundering and unlicensed money transmitting offenses that generated the illicit Payza proceeds.   U.S.S.G. § 2S1.1(a)(1) directs the court to calculate the offense level for the underlying offense, before applying specific offense characteristics under subsection (b).   But here, the prevailing offense level for the underlying offenses is itself calculated under U.S.S.G. § 2S1.1(a)(2) because Payza acted as a third-party money launderer to launder the proceeds of Ponzi schemes and other frauds.   *MH Pillars Ltd.*, No. 18-cr-53, ECF No. 90 (Plea Agreement), at 4-5.   Thus, the government estimates that the following calculations would apply:

| U.S.S.G. § 2S1.1(a)(2) | Base offense level | 8 |
|---|---|---|
| U.S.S.G. § 2B1.1(b)(1)(K) | More than $9,500,000 | +20 |
| U.S.S.G. § 2S1.1(b)(2)(C) | Defendant in business of laundering | +4 |
| | **Total offense level:** | **32** |

At Criminal History Category II, the sentencing range for offense level 32 would be 135-168 months of imprisonment, *i.e.*, 11 to 14 years.   At Criminal History Category III, the sentencing range for offense level 32 would be 151-188 months of imprisonment, *i.e.*, 12 to 15 years.

He is also liable to forfeit the 450 BTC (which has been restrained by Blockchain.com in the United Kingdom) as property "involved in" the offenses alleged in Counts One and Two, *see* 18 U.S.C. § 982(a)(1).

The realistic prospect of more than 10 years of jail time and millions of dollars in financial penalties provides a strong incentive to flee.   *See Otunyo*, 2020 WL 206504, at *4 (finding that, *inter alia*, "guidelines sentencing range of up to 11 years in prison if convicted of the current charges," weighs "strongly in favor of detention"); *United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. Sept. 26, 2018) (unpublished) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee.").

### A.  The Weight of the Evidence Against the Defendant

The government's case against the defendant is strong.   This is an indicted case in which the grand jury found probable cause to believe the defendant is guilty of the charged offenses. *See, e.g.*, *United States v. Johnson*, 212 F. Supp. 3d 126, 129 (D.D.C. 2016) (noting indictment is "not dispositive" but still relevant).   A mountain of objective evidence points to the defendant's control over the Blockchain.com account used in the scheme: the defendant's phone number, the defendant's email address, a street address in Belize that the defendant previously used for shell companies associated with Payza, IP addresses resolving to locations in Canada where the defendant was located—even the use of names and personalities close to the defendant, including the defendant's father (Musa Patel) and an employee of the defendant's company (Vineet Tewari). And the defendant above all others had an irresistible motive to launder the 450 BTC to prevent its forfeiture in the Payza case.

The scale of the defendant's deception also defies innocent explanation.   The defendant took elaborate steps to conceal his true identity as the true owner of the Blockchain.com account and orchestrator of the scheme.   He offered transparently false explanations in response to Blockchain.com's due diligence efforts—claiming that there was "no way" to change the account name after setting it up five days earlier, and claiming that the 450 BTC came from an unnamed "friend's account" after sitting idle for years.

The defendant may well contest the tracing of the 450 BTC back to Payza's illegal operations.   But if the 450 BTC came from legitimate sources, why would the defendant have engaged in such elaborate deceptions—opening an account under a false name, providing false and misleading information about the source of the funds, using the apparent services of one of his overseas employees?   And why would the defendant not disclose these supposedly legitimate funds pursuant to his plea agreement?

In sum, the strength of the evidence in this straightforward case weighs in favor of pretrial detention.

## B.  The Defendant's History and Characteristics

Among the factors the Court is required to take into account in considering pretrial detention is "whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law."   18 U.S.C. § 3142(g)(3)(B).   Here, the defendant was on pretrial release following his sentencing in the Payza case, and pending his self-surrender to prison for "completion of [his] sentence."   The timing was not a coincidence.   The defendant deliberately took advantage of his sentencing court's indulgence in allowing him to remain on

release pending self-surrender in order to conceal forfeitable assets.   This factor weighs quite heavily in favor of pretrial detention.   *See Otunyo*, 2020 WL 2065041, at *6 (finding, where defendant's offense occurred while he was on probation, that he "has thus demonstrated a willful disregard of and failure to comply with court orders").

The defendant's history and characteristics otherwise weigh in favor of pretrial detention. The defendant is a citizen of Canada with no ties to the United States.   Based on the blockchain analysis conducted in this investigation, the government believes the defendant has access to several private Bitcoin wallets containing potentially millions of dollars in BTC.   If released, the defendant could access these wallets from anywhere in the world to finance his flight from prosecution.   *See United States v. Ilya Lichtenstein*, No. 22-mj-22 (RMM/BAH), ECF No. 25 (Order of Detention Pending Trial), at 7-8 (finding that "defendant's apparent access to substantial financial resources that could be used to facilitate his flight, including 7,506 Bitcoin (currently valued at over $328 million)" weighed in favor of pretrial detention); *United States v. Gary James Harmon*, No. 21-cr-433 (BAH), ECF No. 20 (Order of Detention Pending Trial), at 10 (finding that defendant's "demonstrated ability to remotely access and launder bitcoin from anywhere in the world with an Internet connection" weighed in favor of detention) (internal quotations and alterations omitted), *aff'd*, 2021 WL 6102456 (D.C. Cir. Dec. 20, 2021) (unpublished).

To be sure, in the Payza case, the defendant was released on personal recognizance to his residence in Canada during the proceedings, and the government acknowledges that he showed up for his hearings and ultimately self-surrendered to serve his sentence.   But the defendant's surface-level compliance was not complete, as the grand jury found in returning the Indictment in this case for offenses committed while the defendant was on release.

### C.  Danger of Future Obstruction

Finally, the defendant poses a danger of future obstruction.   Courts in this district and elsewhere have recognized that the risk of future obstructive conduct may justify pretrial detention. *See, e.g.*, *United States v. DeGrave*, 539 F.Supp.3d 184, 199 (D.D.C. 2021) (collecting cases); *United States v. Robertson*, 608 F. Supp. 2d 89 (D.D.C. 2009); *United States v. Gamble*, 2019 WL 6877755 (D.D.C. Dec. 17, 2019).   Here, the defendant's indicted conduct involves concealing assets that he knew would have been subject to forfeiture in his criminal case.   Although not charged as an obstruction offense, the defendant's conduct was intended to frustrate the criminal forfeiture proceeding and indicates a lack of respect for the Court's authority and any release conditions that it might impose.   *See DeGrave*, 539 F. Supp. 3d at 208 ("Mr. DeGrave's demonstrated a lack of respect for the courts and the rule of law . . . raises further concern that he would not comply with any release conditions that this Court might impose.").   It also reflects that the defendant has little to no respect for the Court's authority and no compunction about frustrating the due administration of justice; he was not chastened by his prior conviction and did not hesitate to defy the Court's forfeiture order.   Thus, this factor also weighs in favor of detention.

## <u>CONCLUSION</u>

At the time of the instant offense, the defendant was under his release pre-trial and post-sentencing release conditions to not commit any other offenses.   He was subject to a Court Order that forfeited all of the property involved in the offense to which he had pled guilty.   He had agreed in his plea agreement to identify all of his assets.   He was unable and unwilling to comply with any of those obligations.   The defendant's inability to satisfy those simple straight forward

requirements strongly support the Government's argument that he will not comply with any release conditions set by the Court and that his access to millions of dollars that he can access to finance his flight from prosecution.

The government submits that the release conditions ordered by the Magistrate Judge will not adequately counter the risk of flight that the defendant presents.   Notably, the Pretrial Services Agency report also recommends that "no condition or combination of conditions can reasonably assure the defendant's appearance or safety to the community."   The government submits that in light of the factors contained herein, the defendant should not be released.

For the foregoing reasons, the defendant poses a serious risk of flight and no conditions or combination of conditions will assure his appearance in Court.   Accordingly, the government respectfully requests that the Court reverse the Magistrate Judge's Order and grant the government's motion to detain the defendant pending trial in this case.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY:    */s/ Christopher B. Brown*
Arvind K. Lal, D.C. Bar No. 389496
Christopher B. Brown, D.C. Bar No. 1008763
Assistant United States Attorneys
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7688 (Lal)
Arvind.Lal@usdoj.gov