UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES,<br><br>v.<br><br>FIROZ PATEL,<br><br>*Defendant.* | No. 23-cr-166 (DLF) |

**MEMORANDUM OPINION**

Before the Court is Defendant Firoz Patel's motion to suppress 450 bitcoin from introduction at trial. Dkt. 66. In the alternative, he requests a hearing under *Franks v. Delaware*, 438 U.S. 154, 155 (1978). Dkt. 67. Patel's motion suffers, however, from a fundamental defect: the government does not intend to introduce the 450 bitcoin at trial. The exclusionary rule thus has no application here. But even if the rule applied, the seizure warrant was supported by probable cause, and Patel has failed to present evidence justifying a *Franks* hearing. For the reasons that follow, the Court will deny his motions.

**I.     BACKGROUND**

On July 16, 2020, Defendant Firoz Patel pleaded guilty in *United States v. MH Pillars*, No. 18-cr-53, in connection with an unlicensed money-transmitting service known as MH Pillars or Payza. As part of his plea agreement, Patel consented to forfeit any property involved in the *MH Pillars* offense. The government alleges that between the time of Patel's sentencing and self-surrender to the Bureau of Prisons, he transferred 450 bitcoin (approximately $24 million) into a Blockchain.com account even though the funds were subject to forfeiture under his plea agreement. In early 2022, the government seized the 450 bitcoin subject to a warrant and subsequently charged Patel in connection with the transfer of the cryptocurrency.

Before delving into the specifics of this case, the Court offers a brief word about Bitcoin and cryptocurrency more generally.

### A.     Bitcoin

Cryptocurrency is a digital currency that is not backed by "physical commodities or sovereign obligation." *United States v. Sterlingov*, No. 21-cr-399, 2024 WL 860983, at *2 (D.D.C. Feb. 29, 2024) (quoting Sarah Meiklejohn *et al.*, *A Fistful of Bitcoins: Characterizing Payments Among Men with No Names*, 59 Commc'ns of the ACM 86, 86 (2016)).  It derives its prefix "crypto-" from the use of cryptography to verify transactions and generate more units of cryptocurrency.  *See* Meiklejohn, *supra*, at 86.  "Although other cryptocurrencies exist, Bitcoin is the most popular." *Sterlingov*, 2024 WL 860983, at *2.

Bitcoin is a "peer-to-peer network enabling proof and transfer of ownership—of units, or tokens, also called bitcoin—without involving a third-party such as a bank."[1] *United States v. Harmon*, 474 F. Supp. 3d 76, 80 (D.D.C. 2020).  Bitcoin transactions are recorded on a public ledger known as the "blockchain."  To transfer bitcoin, there must be (1) a sending address, (2) a receiving address, and (3) a private encryption key.  *Sterlingov*, 2024 WL 860983, at *2.  Each address on the blockchain is associated with "a cryptocurrency balance."  Adam J. Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*, 101 Tex. L. Rev. 877, 886–87 (2023).  When bitcoin is "transferred," the "address associated with [that] amount of cryptocurrency on the blockchain" adjusts accordingly.  *Id.* at 887.  The so-called "private key" serves as a "password" that the transferor of bitcoin must use to "digitally sign the transaction" before any bitcoin changes hands.  *Id.*  "[W]ithout the private key, it is impossible to access

---

[1] Like other judges in this district, the Court will refer to the Bitcoin system as a whole with an uppercase "B" and specific units of bitcoin currency with a lowercase "b." *See Harmon*, 474 F. Supp. 3d at 80; *Sterlingov*, 2024 WL 860983, at *2.

2

cryptocurrency associated with a blockchain address" and to initiate a transaction on the blockchain.  *Id.*  An individual's "[o]wnership of bitcoin is thus based on [his] possession or knowledge of the private key associated with a public key and address."  *Harmon*, 474 F. Supp. 3d at 82.  Many Bitcoin users will securely "store their [private] keys in crypto wallets."  Levitin, *supra*, at 888.

Each bitcoin transaction is recorded on the blockchain and is thus, in a sense, "public."  But the blockchain records "only the sender's address, the receiver's address, and the amount of Bitcoin transferred," not the private keys associated with the sender or recipient.  *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).  As a result, the "owners of the addresses are anonymous on the Bitcoin blockchain."  *Id.*  Despite this anonymity, "it is possible to discover the owner of a Bitcoin address by analyzing the blockchain."  *Harmon*, 474 F. Supp. 3d at 82.

**B.**     ***MH Pillars* Prosecution**[2]

Around 2004, Firoz Patel and his brother Ferhan Patel founded an online money-transmitting business known as AlertPay.  *See* Statement of Offense ¶ 7, *United States v. MH Pillars, Ltd.*, No. 18-cr-53, Dkt. 91.  AlertPay operated "worldwide, including in the United States," and "[m]any of the merchants that AlertPay accepted as customers did not go through a full compliance review."  *Id.* ¶¶ 7–8.  Firoz Patel "knew that AlertPay was transmitting illegal proceeds," including from pyramid, multilevel marketing, and Ponzi schemes.  *Id.* ¶¶ 9–10.  AlertPay also lacked a "license to operate in any state in the United States or the District of Columbia" and received a cease-and-desist letter from state regulators.  *Id.* ¶ 17.  AlertPay ignored such cease-and-desist letters and on numerous occasions "disable[ed] new customer signups" to

---

[2] The Court relies on the statement of facts attached to Patel's plea agreement in *United States v. MH Pillars, Ltd.*, No. 18-cr-53.

avoid detection from "state regulators, who often conducted spot tests by attempting to sign up as a new customer." *Id.* ¶¶ 18–19.  In addition, Patel hired compliance consultants who warned him about AlertPay's illegal U.S.-based operations, but he ignored this advice and fired the consultants. *See id.* ¶¶ 22–23.

In 2012, Patel purchased MH Pillars (doing business as "Payza"), a United Kingdom-based company. *See id.* ¶¶ 25–26.  Payza in turn purchased AlertPay, but "[n]o substantive changes took place during the rebrand."  *Id.* ¶ 28.  Payza also entered an agreement with another money-transmitting business, Obopay.  *See id.* ¶¶ 30, 32.  Under the agreement, Payza served as an Obopay "delegate," allowing Payza to operate under Obopay's licensure in authorized states.  *See id.* ¶ 32.  Payza was required to submit customer lists to Obopay, but Payza "would sanitize" the lists "to remove known illegal merchants."  *Id.* ¶ 38.  Between July 2011 and March 2013, AlertPay/Payza "transmitted millions of dollars to the United States from Canada" and vice versa. *Id.* ¶ 39.  On May 10, 2013, Obopay "officially asked [Payza] to cease activity in states where they are unlicensed," but Payza "refused" to do so.  *Id.* ¶ 40.

On August 11, 2014, Payza allegedly announced that "customers could now purchase bitcoin and withdraw funds from their Payza accounts to their Bitcoin wallets."  Compl. at 12, Dkt. 1-1.  Payza also allegedly partnered with Coinapult, a Panama-based cryptocurrency wallet service provider, to ensure Payza had the required bitcoin to operate in the "digital currency space."  *Id.* In all, Payza "caused over $250,000,000 to be illegally transmitted."  Statement of Offense ¶ 86.

On March 18, 2018, MH Pillars, Ltd./Payza, Firoz Patel, and Ferhan Patel were indicted. Firoz Patel was charged with conspiracy to operate a money-transmitting business, conspiracy to commit an offense against the United States, and the operation of an unlicensed money-transmission business.  *See* Indictment at 7–20, *MH Pillars*, No. 18-cr-53, Dkt. 1.  Patel ultimately

pleaded guilty to conspiracy to commit offenses against the United States in violation of 18 U.S.C. § 371 and conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h).  *See* Plea Agreement at 1, *MH Pillars*, No. 18-cr-53, Dkt. 90.  As part of his plea agreement, Patel consented to "the entry of a forfeiture money judgment for a sum of money equal to the value of seized and restrained property by the government," totaling $4,620,459.45.  *Id.* at 11; *see* Mot. to Suppress at 3, Dkt. 66.  He also agreed that the government could "seek to forfeit any of [his] assets, real or personal, that are subject to forfeiture under any federal statute, whether or not this agreement specifically identifies the asset."  Plea Agreement at 11, *MH Pillars*, No. 18-cr-53.  The government could seek "forfeiture of all interest in . . . any property, real or personal, involved in the offense to which [Patel] plead[ed] guilty, and any property traceable thereto."  *Id.*  On November 10, 2020, Patel was sentenced to thirty-six months' imprisonment and twenty-four months' supervised release.  *See* Judgment at 2–3, *MH Pillars*, No. 18-cr-53, Dkt. 136.  Patel was ordered to self-surrender at FCI Danbury on February 26, 2021, *see id.*, but due to the COVID-19 pandemic, his self-surrender date was delayed until June 11, 2021.

      **C.**      **Procedural Background**

The government alleges that on April 27, 2021—after Patel's sentencing and before his self-surrender date—he transferred 450 bitcoin (approximately $24 million) to an interest-earning account at Blockchain.com.  *See* Aff. in Supp. of Crim. Compl. at 23, Dkt. 1-1.  The government alleges that the Blockchain.com account was registered to a phone number and email "known to be associated with Firoz Patel."  *Id.*  As alleged, the 450 bitcoin are "derived directly from Payza's illicit business operations."  *Id.* at 38.  On January 11, 2022, a magistrate issued a warrant to seize the 450 bitcoin based on an application submitted by Department of Homeland Security Special Agent Eugene Sveum.  *See id.* at 18; Aff. in Supp. of an Application for a Seizure Warrant ("Aff.")

at 1–2, Dkt. 72-1.  On May 11, 2023, a grand jury returned an indictment charging Patel with laundering of monetary instruments in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a).

Trial was initially scheduled for April 15, 2024, but the Court granted the parties' joint motion to continue trial until May 20, 2024.  *See* Min. Order of March 1, 2024.  In addition to this motion to suppress, Dkt. 66, Patel filed a motion to dismiss for lack of subject-matter jurisdiction, Dkt. 69, and a motion to dismiss for a double-jeopardy violation or, in the alternative, plea-agreement breach, Dkt. 68.  On April 21, 2024, defense counsel informed the Court that Patel would likely pursue an interlocutory appeal if the Court denied either of the motions to dismiss.  To prevent any further delay to Patel's trial, which is currently scheduled for May 20, 2024, the Court issued an initial Memorandum Opinion & Order denying both motions to dismiss.  *See United States v. Patel*, No. 23-cr-166, 2024 WL 1856409 (D.D.C. Apr. 24, 2024).  On April 25, 2024, defense counsel informed the Court that Patel would pursue an interlocutory appeal of the denial of his double-jeopardy motion.  The Court now turns to Patel's motion to suppress.

**II.     LEGAL STANDARDS**

The Fourth Amendment prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "Probable cause is not a high bar."  *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (cleaned up).  "It 'requires only a substantial chance of criminal activity, not an actual showing of such activity.'"  *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)).  A reviewing court's duty is "simply to ensure that the magistrate had a substantial basis" for determining that probable cause existed before issuing a warrant.  *Gates*, 462 U.S. at 238–39 (1983) (cleaned up).  Supporting affidavits are

entitled to a "presumption of validity," *Franks*, 438 U.S. at 171, and a magistrate judge's "initial determination of probable cause" is entitled to "great deference," *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (quoting *Gates*, 462 U.S. at 236).

"[T]he principal judicial remedy to deter Fourth Amendment violations" is "to exclude unlawfully seized evidence in a criminal trial" under the exclusionary rule. *Utah v. Strieff*, 579 U.S. 232, 237 (2016). The "exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and . . . evidence later discovered and found to be derivative of an illegality, the so-called fruit of the poisonous tree." *Id.* (cleaned up). Moreover, "[u]nder the good-faith exception to the exclusionary rule, 'evidence seized in reasonable, good-faith reliance on a search warrant' need not be excluded, even if the warrant turns out to have been unsupported by probable cause." *Griffith*, 867 F.3d at 1278 (quoting *United States v. Leon*, 468 U.S. 897, 905 (1983)).

A seizure warrant may be invalid, however, if the issuing magistrate was "misled [with respect to a material fact or omission] by information that the affiant knew was false or would have known was false except for his reckless disregard for the truth." *Leon*, 468 U.S. at 922-23. A defendant may be entitled to an evidentiary hearing (i.e., a *Franks* hearing) on the warrant application upon a "substantial preliminary showing" that (1) "the affidavit contained false statements" or omitted certain facts; (2) those false statements or omissions were "material to the issue of probable cause"; and (3) the false statements or omissions "were made knowingly and intentionally, or with reckless disregard for the truth." *United States v. Richardson*, 861 F.2d 291, 293 (D.C. Cir. 1988); *see United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (applying *Franks* standard to material omissions). A defendant seeking a *Franks* hearing must make "more

7

than conclusory" allegations "supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.

III.   **ANALYSIS**

Patel raises two arguments in his motion.  First, he argues that the 450 bitcoin was unlawfully seized under the Fourth Amendment and should thus be excluded from introduction at trial.  Second, in the alternative, he contends that the affidavit in support of the seizure warrant contains material falsehoods, such that the Court should grant his request for a *Franks* hearing.  The Court disagrees.

    **A.**   **Motion to Suppress**

        1.   *450 Bitcoin*

Patel's motion fails from the start because the exclusionary rule does not apply in this context.  The exclusionary rule is a "judicially created remedy" to exclude "evidence obtained in violation of the Fourth Amendment" "*in a criminal proceeding* against the victim of the illegal search and seizure."  *United States v. Calandra*, 414 U.S. 338, 347–8 (1974) (emphasis added). The exclusionary rule is a rule of evidence, *see United States v. McSurely*, 473 F.2d 1178 (D.C. Cir. 1972), and is accordingly "confined to situations where the Government seeks to use such evidence" at trial "to incriminate the victim of the unlawful search."  *Calandra*, 414 U.S. at 348.

The government represents that it does not intend to introduce at trial the 450 bitcoin, Opp'n to Def.'s Mot. to Suppress ("Opp'n") at 7, Dkt. 72, so the exclusionary rule does not apply here.[3]  Nor has Patel represented that there are any fruits of the seizure.  As such, there is simply

---

[3] The government represents that even if it would like to use the 450 bitcoin at trial, it cannot because the bitcoin is currently "restrained under UK law in a Blockchain.com suspension account.  A restraint order issued by a UK court and served on Blockchain.com prevents the company from doing anything to remove from England and Wales or in any way dispose of, deal with or diminish the value of the 450

8

no evidence to exclude, rendering Patel's motion to suppress, in the government's words, "moot" (in the colloquial, not Article III, sense of the word). *See United States v. Kahre*, 737 F.3d 554, 565 (9th Cir. 2013) (describing a motion to suppress as "moot because the government was not introducing the seized evidence at trial"); *United States v. Lingala*, 91 F.4th 685, 694 (3d Cir. 2024) (collecting mootness cases).

Although other circuits have addressed suppression "mootness" (or simply, inapplicability) in this context, the D.C. Circuit has not. But this concept is a natural outgrowth of the exclusionary rule. The purpose of the rule is "not to redress the injury to the privacy of the search victim" but rather "to deter future unlawful police conduct . . . by removing the incentive to disregard it." *Calandra*, 414 U.S. at 347 (cleaned up). The "only effectively available way" to deter such misconduct in a criminal trial is through the exclusion of evidence seized in violation of the Fourth Amendment and the fruits thereof. *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)); *see Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). But if no such evidence is brought to trial, there is no exclusionary remedy the Court could order. And, in any event, Patel has received all the relief the exclusionary rule could offer: namely, the exclusion of evidence from trial, albeit by government inaction, not court order.

2. *Blockchain-Tracing Analysis*

Further, as the government highlights, Patel has not moved to suppress "blockchain-tracing evidence." Opp'n at 9. And even if he had, suppression of the blockchain-tracing evidence would be inappropriate on this record. For starters, as Agent Sveum's affidavit makes abundantly clear, the government performed its blockchain-tracing analysis, at least in part, before the seizure of the

---

BTC without the consent of the UK Crown Court." Opp'n at 6 (cleaned up); *see* discussion *infra* Section III.A.3.

9

450 bitcoin. *See* Aff. at 23–39. It was this very tracing evidence that led to the seizure of the 450 bitcoin, so the tracing evidence cannot conceivably be labeled as a "fruit" of the seizure.

For another, Patel has "no legitimate expectation of privacy of [bitcoin] data on the blockchain," dooming any suppression argument. *In re Search of Multiple Email Accounts Pursuant to 18 U.S.C. § 2703 for Investigation of Violation of 18 U.S.C. § 1956*, 585 F. Supp. 3d 1, 18 (D.D.C. 2022); *see Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, *J.*, concurring). As discussed *supra*, the blockchain is a public ledger reflecting "(1) the amount of Bitcoin transferred, (2) the Bitcoin address of the sending party, and (3) the Bitcoin address of the receiving party." *Gratkowski*, 964 F.3d at 311–12. Under the well-established third-party doctrine, a defendant lacks a "legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743 (1979). For example, in *United States v. Miller*, the Supreme Court held that a defendant lacked a reasonable expectation of privacy in canceled checks, deposit slips, and monthly statements submitted to his bank. 425 U.S. 435, 440 (1976). Such "negotiable instruments to be used in commercial transactions" were "exposed to employees in the ordinary course of business," and the defendant took "the risk, in revealing his affairs to another, that the information [would] be conveyed by that person to the Government." *Id.* at 443. It follows that Patel lacked any reasonable expectation that information shared on the blockchain, a publicly recorded ledger, constituted "confidential communications" protected by the Fourth Amendment. *Id.* at 442.

Although Patel has not argued that blockchain transactions fall into *Carpenter v. United States*'s gloss on the third-party doctrine, 138 S. Ct. 2206 (2018), any such argument would lack merit. Unlike cell-site location information, blockchain transactions are not "a pervasive [or] insistent part of daily life," *id.* at 2220 (cleaned up), and the information displayed on the

blockchain is made public by "an 'affirmative act' by the Bitcoin address holder," *Gratkowski*, 964 F.3d at 312 (quoting *Carpenter*, 138 S. Ct. at 2220). Indeed, it is the blockchain's very design that "each . . . transaction is recorded in a publicly available" manner that can be verified by others. *Id.* A blockchain user thus assumes the risk of turning over information by transacting in cryptocurrency.

### 3. *Patel's Counterarguments*

Patel's arguments for the suppression of the 450 bitcoin are unavailing. He disputes the government's disavowal of possession over the 450 bitcoin, *see* Reply at 2–3, Dkt. 77, but that issue has no bearing on "mootness." Regardless of whether the United States or another entity has possession of the 450 bitcoin, the United States has no intention of introducing it at trial—a dispositive issue for Patel's position. Moreover, contrary to Patel's suggestion, *see id.* at 6, the Court's denial of the motion to suppress does not leave him without recourse to challenge the seizure.[4] Indeed, he could move under Rule 41(g) of the Federal Rules of Criminal Procedure as "the owner of property the government has seized in a search to seek its return." *In re Sealed*, 716 F.3d 603, 605 (D.C. Cir. 2013); *see also Strieff*, 579 U.S. at 237 ("Because officers who violated the Fourth Amendment were traditionally considered trespassers, individuals subject to unconstitutional searches or seizures historically enforced their rights through tort suits or self-

---

[4] Although the parties' briefs do not address whether Patel's plea agreement in *MH Pillars* functionally forfeits some or all of Patel's property interest in the 450 bitcoin, the Court assumes, without deciding, that Patel has such an interest. *But see United States v. Jones*, 565 U.S. 400, 408 (2012) ("[O]ur very definition of 'reasonable expectation of privacy' . . . [is] an expectation that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." (cleaned up)). The Court notes, however, that as a general matter, the Due Process Clause does not "require the government to provide a person the opportunity to challenge the seizure of property he has voluntarily forfeited." *United States v. 8 Gilcrease Lane*, 638 F.3d 297, 300 (D.C. Cir. 2011).

help."). In fact, according to the government, Patel is already aware of such remedies, as he filed a civil action in the U.K. High Court of Justice asserting the 450 bitcoin was his. *See* Opp'n at 6.

But even assuming suppression of the 450 bitcoin could in some way be the proper remedy here, the magistrate had a substantial basis for determining there was probable cause to seize the cryptocurrency. Patel appears to concede as much. His motion focuses entirely on Agent Sveum's alleged "material omissions and false statements." Mot. to Suppress at 8. It does not contend that the affidavit otherwise lacks probable cause sufficient to issue a seizure warrant for the 450 bitcoin.

Nor could Patel have successfully raised any such challenge because the government properly exercised its authority to seek pretrial criminal forfeiture. 18 U.S.C. § 982 permits a court to order that a person "convicted of an offense in violation of [18 U.S.C. §§ ] 1956, 1957 . . . forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." Courts are further empowered, "[u]pon application of the United States," to "enter a restraining order" before trial "to preserve the availability of property" that is "constituting, or derived from, any proceeds . . . obtained, directly or indirectly, as the result" of a criminal offense or "used, or intended to be used, in any manner or part, to commit, or to facilitate the commission, of such" a criminal offense. 21 U.S.C. § 853(a)(1)–(2), (e). The government may also "request the issuance of a warrant authorizing the seizure of property subject to forfeiture" if "an order . . . may not be sufficient to assure the availability of the property for forfeiture." 21 U.S.C. § 853(f). Such pretrial asset restraints are constitutionally permissible when there is "probable cause to think (1) that the defendant has committed an offense permitting forfeiture, and (2) that the property at issue has the requisite connection to that crime." *Kaley v. United States*, 571 U.S. 320, 323–24 (2014).

Both requirements are satisfied. As to the first prong, the Supreme Court held in *Kaley* that "[a]n indictment fair upon its face, and returned by a properly constituted grand jury . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged." 571 U.S. at 328 (cleaned up). "A defendant has no right to judicial review of a grand jury's determination of probable cause." *Id.* at 333. Here, a grand jury returned an indictment charging Patel under 18 U.S.C. § 1956 and § 1957. Indictment, Dkt. 5. The grand jury thus concluded that there was probable cause to believe that Patel committed "offense[s] permitting forfeiture" under 18 U.S.C. § 982(a)(1). In "contesting the seizure of" the 450 bitcoin, Patel seeks to "relitigate . . . a grand jury finding" not subject to review. *Kaley*, 571 U.S. at 333.

Regarding the second prong, the government has satisfactorily shown that there was probable cause to believe the 450 bitcoin had "the requisite connection to [those] crime[s]." *Kaley*, 571 U.S. at 324. 18 U.S.C. § 982(a)(1) "'sweeps broadly' to cover all funds 'involved in' money laundering, money laundering conspiracy, or operating an unlicensed money transmitting business." *Sterlingov*, 2023 WL 2387759, at *5 (quoting *United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019)). The D.C. Circuit has "yet definitively to interpret" § 982(a)(1) and answer related questions, including whether clean funds that are not derived from specified-unlawful activity can ever be "involved in" money laundering for forfeiture purposes. *Id.* "[O]ther circuits have," however, "held that funds 'involved in' money laundering include those that 'facilitate' the money laundering scheme, which encompasses unlaundered funds when they are transferred in order to conceal the nature and source of [criminal] proceeds." *Bikundi*, 926 F.3d at 793. As Judge Moss has aptly noted, "[t]his interpretation of § 982(a) comports with the plain language of the statute and with common sense." *Sterlingov*, 2023 WL 2387759, at *6. It also tracks the ordinary operation of money laundering, which "depends upon the use of legitimate monies to advance or

13

facilitate the scheme," leading to the inevitable mixture of clean and unclean funds. *Bikundi*, 926 F.3d at 793. Thus, on the Court's reading, § 982(a)(1) covers "forfeiture of legitimate and illegitimate funds commingled in an account . . . as long as the government demonstrates that the defendant pooled the funds to facilitate, i.e., disguise the nature and source of . . . his scheme." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998); *see Sterlingov*, 2023 WL 2387759, at *6 (collecting court-of-appeals authority adopting the same interpretation); *cf. United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352–53 (D.C. Cir. 2002) (noting 18 U.S.C. § 1956—the statute charged here—covers "a particular sum . . . used as the bankroll facilitating the fraud").

Agent Sveum's affidavit provides ample support to conclude that the 450 bitcoin constitutes funds "involved in" money laundering. In 40 pages, Agent Sveum provides evidence that Patel consolidated in a private wallet "49 unspent deposits totaling approximately 477.77 BTC" derived from Payza's illicit operations and then, through pseudonyms and other means, transferred approximately 450 bitcoin from the private wallet to an interest-earning Blockchain.com account in the United Kingdom. Aff. at 28.

The affidavit provides substantial support to conclude that the 450 bitcoin was derived from Payza's illicit operations. To start, Agent Sveum provides an overview of Payza's operations, the "focus" of which involved "the transmission of funds from numerous locations in the United States where Payza was not licensed." *Id.* at 9. "A large amount of these funds was transferred in and out of Payza's bank accounts, to include cryptocurrency wallets, held in or accessed in the United States." *Id.* With this background in mind, Agent Sveum then details how between 2017 and 2021, Payza-derived proceeds (totaling approximately 450 bitcoin) were deposited into a single private wallet controlled by Patel. The Agent represents that six of the deposit sources

14

"exhibited unusual activity consistent with consolidation wallets," which are "sometimes used to collect payments from many different customers, or to collect funds from the victims of frauds, scams, Ponzi schemes, or other cryptocurrency-enabled crimes." *Id.* at 30. For example, Consolidation Wallet 1 "was funded by 31 deposits" but "only made one withdrawal" to the private wallet—"indicative of some sort of illicit activity" in the Agent's experience. *Id.* at 30–31. All six Consolidation Wallets were funded when "Payza was still operational and after Payza started accepting Bitcoin" and made deposits into the same private wallet. *Id.* at 30–32. Agent Sveum also describes how Consolidation Wallet 7 "receiv[ed] 1,835 deposits" including from "known dark web criminal enterprises," but Consolidation Wallet 7 only ever made "seven withdrawals" to the private wallet and Patel's private wallet on another cryptocurrency exchange. *See id.* at 33–34. From this (and other information not repeated here), Agent Sveum deduces that Consolidation Wallet 7 was "most likely owned and controlled" by Patel and "utilized as part of Payza's business operations." *Id.* at 33, 35. In addition, two additional deposits were made into the private wallet on April 22 and 23, 2021—*i.e.*, between Patel's sentencing and self-surrender in *MH Pillars*, and Agent Sveum provides evidence that both deposits "originated from a single account . . . owned by Firoz Patel." *Id.* at 28–29. On April 27, 2021, the 450 bitcoin consolidated in the private wallet were then transferred into an interest-earning Blockchain.com account in the name of Patel's father Musa Patel. *See id.* at 23–24.

The manner in which Patel allegedly transferred the 450 bitcoin to Blockchain.com lends further support that the funds were involved in unlawful activity. The affidavit explains that the 450 bitcoin were transferred to Blockchain.com in the window between Patel's sentencing in *MH Pillars* and self-surrender. *See id.* at 25–27. Upon receipt of the funds, Blockchain.com froze the 450 bitcoin, and one "Vineet Tewari" contested the freeze via email. *Id.* Vineet Tewari is the

15

name of a Payza employee who worked in India, but according to "payment information obtained from Google," Patel himself owned the email address used by "Tewari." *Id.* at 25. Also the "majority of the logins to [the] [e]mail [a]ccount . . . had an IP address that comes back to a location in Quebec, Canada (where Firoz Patel lived prior to his self-surrender)." *Id.* at 26. It is thus reasonable to conclude that "Vineet Tewari" was either Patel himself using a pseudonym or an agent operating under Patel's instruction. The use of a Payza employee's name also strengthens the inference that the 450 bitcoin were connected to Payza. Given that Patel's plea agreement in *MH Pillars* subjected to forfeiture any assets "involved" in *MH Pillars*, it was reasonable for Agent Sveum to conclude that Patel used pseudonyms and other evasive means to conceal Payza-derived assets from potential forfeiture.

The affidavit provides a sufficient basis to conclude that the 450 bitcoin were "involved in" or directly derived from Payza's unlawful operation as an unlicensed money transmitting business. And caselaw on "the operation of an unlicensed money transmitting business" suggests that "all money transmitted through such a business is subject to forfeiture." *Sterlingov*, 2023 WL 2387759, at *6. Not only does Patel fail to challenge this conclusion in his motion, but he also acknowledged as much in his *MH Pillars* sentencing memorandum, admitting that "all of the money that flowed through th[e] [Payza] platform is deemed to be illegal." Def.'s Mem. in Aid of Sent'g at 4 n.1, *MH Pillars*, No. 18-cr-53, Dkt. 118. The Court thus concludes that Agent Sveum had probable cause to believe that the 450 bitcoin were "used, or intended to be used" to "commit" or "facilitate the commission" of money laundering and/or money-transmitting business.[5]  21 U.S.C. § 853.

---

[5] The Court also notes that the grand jury's forfeiture allegation found "by probable cause that the specific property subject to forfeiture"—*i.e.*, "property, real or personal, involved in these offenses"—"includes 450 bitcoin seized on or about January 11, 2022." Indictment at 2–3. The Court is not aware of any decision analyzing whether the grand jury's finding of probable cause as to particular assets in a forfeiture

B.     **Request for a *Franks* Hearing**

Patel advances several arguments suggesting a *Franks* hearing is warranted, but none are persuasive. *First*, Patel incorrectly suggests Agent Sveum misstates that the 450 bitcoin "was forfeitable [under] the terms of the Consent Orders of Forfeiture in *MH Pillars*." Mot. to Suppress at 9. The Court previously rejected this argument. *See Patel*, 2024 WL 1856409. The explicit terms of Patel's plea agreement permit the government "to seek forfeiture of 'any of [Patel's] assets' 'whether or not th[e] [plea] agreement specifically identifies the asset[s]" as long as the assets were "involved in the [*MH Pillars*] offense." *Id.* at *6 (quoting Plea Agreement at 11). Patel points to no portion of the affidavit inconsistent with this interpretation.

*Second*, Patel has failed to demonstrate that Agent Sveum made "several false statements regarding the legality of Payza's international operations and the scope and focus of the business." Mot. to Suppress at 12. Specifically, Patel takes issue with the affidavit's failure to mention that "Payza was explicitly permitted to continue its international operations." *Id.* But Payza's plea agreement in *MH Pillars* provided, among other things, that "to the extent it is an active and ongoing organization," Payza must "implement and e[n]hance a compliance and ethics program . . . and training." Plea Agreement at 4, *MH Pillars*, No. 18-cr-53, Dkt. 88. Implicit in this language is a recognition that Payza could potentially continue its operations overseas. Patel may well be correct that "the Government was aware of, and consented to, the ongoing operations of Payza's international business operations" as a forward-looking matter, Mot. to Suppress at 15, but he points to no language in the plea agreement that the government could not seek forfeiture

---

allegation is dispositive under *Kaley*'s traceability prong. But the Supreme Court's reasoning that "a defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime" may suggest the grand jury's finding as to forfeiture is also not subject to legal challenge. *Kaley*, 571 U.S. at 333.

of international Payza proceeds that were generated *before* he entered a plea of guilty in *MH Pillars*. In fact, as discussed in the Court's recent Memorandum Opinion and Order, as part of his plea agreement, Patel consented to the forfeiture of "any" Payza proceeds "involved in" the offense under his plea agreement. *See Patel*, 2024 WL 1856409, at *6.

The Court is also unpersuaded that the affidavit "paint[s] a misleading picture" that the 450 bitcoin has a "U.S.-based origin." Mot. to Suppress at 13. As a preliminary matter, Agent Sveum was clear that Payza operated "in multiple jurisdictions" besides the United States, including "Vietnam, Pakistan, and Egypt." Aff. at 8. As to the Payza's U.S.-based operations, Patel offers no evidence contradicting Agent Sveum's representation that "the focus of Paya's money transmitting business was the transmission of funds from numerous locations in the United States." *Id.* at 9. Moreover, as the government correctly points out, "[t]he 450 BTC was not seizable *only* if traceable to" Payza's U.S.-based proceeds, Opp'n at 20; rather, Patel's plea agreement plainly permitted forfeiture of "any assets" "involved in" his *MH Pillars* offense conduct regardless of geographic origin, Plea Agreement at 11. Patel's efforts to hide the 450 bitcoin from law-enforcement detection also strengthen the conclusion that the funds were somehow derived from or covering up Payza's illicit operations—the "focus" of which involved U.S.-based transmissions. That is sufficient for pretrial forfeiture under 18 U.S.C. § 982.[6]

*Third*, Patel takes issue with the accuracy of several of the affidavit's statements, but none are objectionable when read in context. To start, Patel argues that Agent Sveum misled the

---

[6] Even assuming the seizure application lacked sufficient support for the 450 bitcoin's connection with the United States, suppression would still not be appropriate because "'evidence seized in reasonable, good-faith reliance on a [seizure] warrant' need not be excluded, even if the warrant turns out to have been unsupported by probable cause." *Griffith*, 867 F.3d at 1278 (quoting *Leon*, 4668 U.S. at 905). As discussed *supra*, Patel has proffered no evidence of Agent Sveum's bad faith such that the exclusionary rule would preclude introduction of the 450 bitcoin at trial.

18

magistrate by suggesting "Patel's use of consolidation wallets" indicated illicit activity. Mot. to Suppress at 17. According to Patel, "consolidation wallets can and are used for innocent, lawful purposes." *Id.* But Agent Sveum did not speak in absolutes. He represented that "consolidation wallets are *sometimes* used to collect payments from many different customers, or to collect funds from the victims of frauds, scams, Ponzi schemes, or other cryptocurrency-enabled crimes." Aff. at 30 (emphasis added). What's more, Agent Sveum explains what made Patel's use of consolidation wallets particularly suspicious: namely, the timing and provenance of transactions into and out of consolidation wallets. *See id.* at 30–34.

Patel also objects to Agent Sveum's representation that "maintaining and dispersing assets amongst several accounts" is suggestive of criminal activity. Mot. to Suppress at 17. The problem with this assertion, however, is that the affidavit does not place significant weight on the fact that Patel controlled numerous wallets. Instead, Agent Sveum focused on *how* Patel controlled, consolidated, and transferred cryptocurrency through the multiple wallets.

*Finally*, Patel takes exception to Agent Sveum's representation that "it is likely that Firoz Patel did not disclose these assets because he knew they were derived from Payza's illicit activity and would therefore have been subject to forfeiture." Mot. to Suppress at 17 (quoting Aff. at 37). In Patel's view, Agent Sveum should have pointed out "that the financial disclosure language in the plea agreement is boilerplate and rarely pursued." *Id.* This counterargument also fails because, as discussed *supra*, Agent Sveum accurately characterized Patel's obligations under the plea agreement and the "boilerplate" nature of language in a plea agreement does not render the agreement's terms any less enforceable.

Together, Patel has fallen far short of the high bar required to show false or misleading statements warranting a *Franks* hearing. He slices Agent Sveum's statements far too thin, taking

19

them out of context and failing to identify any untruths or omissions.  His conclusory allegations that Agent Sveum's statements contained "deliberate falsehood[s]" or demonstrated a "reckless disregard for the truth" lack evidentiary support.  *Franks*, 438 U.S. at 171; *see, e.g.*, Mot. to Suppress at 16.  Because Patel has failed to identify any false statements or omissions or present "an offer of proof" of Agent Sveum's bad faith, *Franks*, 438 U.S. at 171, the Court does not reach the issue of materiality.

## CONCLUSION

For the foregoing reasons, the Court will deny Patel's Motion to Suppress, Dkt. 66, and Request for a *Franks* Hearing, Dkt. 67.  A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

May 1, 2024